UNITED STATES of America

v.

F. W. STANDEFER, Appellant.

No. 78–1909.

United States Court of Appeals,
Third Circuit.

Argued Dec. 12, 1978.

Reargued In Banc May 17, 1979.

Decided Aug. 10, 1979.

As Amended Oct. 11, 1979.

Harold Gondelman, Gondelman, Baxter, Mansmann & McVerry, Pittsburgh, Pa., for appellant.

Robert J. Cindrich, U. S. Atty., Craig R. McKey (argued), Asst. U. S. Atty., Frederick W. Thieman, Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

Argued Dec. 12, 1978.

Before ALDISERT, ADAMS and HIGGINBOTHAM, Circuit Judges.

Reargued In Banc May 17, 1979.

Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, GARTH and HIGGINBOTHAM, Circuit Judges.

### OPINION OF THE COURT

ADAMS, Circuit Judge.

This case arises out of a series of substantial gifts made by the Gulf Oil Corporation and two of its officials to Cyril J. Niederberger, an agent of the Internal Revenue Service and the person charged with auditing Gulf's federal income tax returns. As a result of these alleged improprieties, separate indictments were filed against Gulf, Niederberger, and two Gulf employees, Joseph Fitzgerald and Fred W. Standefer. Standefer, the appellant here, was Gulf's Vice-President of Tax Administration, and Fitzgerald was his immediate subordinate.

Standefer was convicted on all nine counts of an indictment charging him with providing illegal gratuities to a public official, in violation of 18 U.S.C. § 201(f), and with aiding and abetting Niederberger in accepting fees, compensation or rewards, other than as permitted by law, for the performance of his duty, in violation of 26 U.S.C. § 7214(a)(2). Before a panel of this Court, Standefer unsuccessfully raised several challenges to his conviction. The court thereafter ordered rehearing *in banc* to consider one of these issues in particular: what effect, if any, should Niederberger's acquittal on three of the counts brought against him under § 7214(a)(2) have on Standefer's conviction for aiding and abetting Niederberger in committing the acts charged in those counts.

We conclude that the outcome of Niederberger's prosecution has no effect on Standefer's conviction, and accordingly affirm on all counts.

### I. FACTS.

From May, 1971, to June, 1974, Gulf Oil Corporation, through Standefer and Fitzgerald, supplied a number of gifts to Niederberger and his family. Five of these gifts were in the form of paid golfing vacations to various resorts and became the subject matter of the indictments returned against Gulf, Standefer, Niederberger and Fitzgerald. Specifically, Gulf paid for: the hotel bill for the Niederberger family in Pompano Beach, Florida; a four-day trip at the Doral Country Club in Miami Beach; a four-day vacation at the Seaview Country Club in Absecon, New Jersey; a trip to Del Monte Lodge in Pebble Beach, California; and a four-day trip to the Desert Inn in Las Vegas, Nevada.

Gulf Oil pleaded guilty as to certain counts of the indictment against it, and Fitzgerald entered a plea of *nolo contendere*. Niederberger and Standefer elected to submit their cases to juries, and were tried separately. Niederberger, whose trial took place first, was charged with five counts of violating 18 U.S.C. § 201(g),[1] one

---

1. 18 U.S.C. § 201(g) provides:
 Whoever, being a public official, former public official, or person selected to be a public official, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly asks, demands, exacts, solicits, seeks,

for each of the trips listed above, and with five counts of violating 26 U.S.C. § 7214(a)(2),[2] also one for each of the trips in question. These statutes forbid the receipt by an IRS agent of gratuities in any way related to the performance of an official duty. Niederberger was convicted on four of the five § 201(g) counts, but a not-guilty verdict was returned regarding the Pompano Beach trip. The jury found Niederberger guilty on only two of the § 7214(a)(2) counts, however, acquitting him on the counts that charged him with accepting the trips to Pompano Beach, Absecon and Miami. He was sentenced to six months in prison to be followed by a five-year period of probation, and fined $5,000. On appeal to this Court his conviction was affirmed. *United States v. Niederberger,* 580 F.2d 63 (3d Cir. 1978), *cert. denied,* 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1979).

Standefer was charged with four counts of violating 18 U.S.C. § 201(f),[3] a companion provision to § 201(g). Section 201(f) prohibits the giving or offering of gratuities to a public official for the performance of an official act. These four counts covered all the trips except that to Pompano Beach. Standefer was also charged with five counts of violating § 7214(a)(2), under the theory that he had aided and abetted Niederberger in accepting the five golfing trips. Although, on its face, § 7214(a)(2) applies

only to government employees, such a charge is possible under federal law as a result of 18 U.S.C. § 2,[4] which allows the punishment of an aider and abettor as if he were a principal. The jury convicted Standefer on all nine counts. He was then sentenced to six months in prison, to be followed by a two-year period of probation, and fined $18,000—$2,000 on each count.

Standefer did not deny that he and Fitzgerald provided the trips in question to Niederberger or that they were paid for with Gulf Oil funds:

> Q. You have heard Mr. Fitzgerald testify that there were golf outings and you approved various lunch, travel and expense vouchers. You heard that testimony?
>
> A. Yes, sir.
>
> Q. And that's true, is it not?
>
> A. Yes, siree.[5]

Thus, despite the refusal of the Niederberger jury to convict Niederberger on either of the Pompano Beach counts, Standefer conceded that he had arranged for payment for Niederberger's Pompano Beach trip:

> Q. Now let's take a look at these various dates called trip dates.
>
> Do you remember the incident involving Pompano?
>
> A. Yes, sir, I do.
>
> Q. Did you know that that trip was taking place before it took place?

---

accepts, receives, or agrees to receive anything of value for himself for or because of any official act performed or to be performed by him.

. . . . .

Shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

**2.** 26 U.S.C. § 7214(a)(2) imposes a criminal sanction against:

Any officer or employee of the United States acting in connection with any revenue law of the United States—
(2) who knowingly demands other or greater sums than are authorized by law, or receives any fee, compensation, or reward, except as by law prescribed, for the performance of any duty.

**3.** 18 U.S.C. § 201(f) provides:
Whoever, otherwise than as provided by law for the proper discharge of official duty, direct-

ly or indirectly gives, offers, or promises anything of value to any public official, former public official, or person selected to be a public official, for or because of any official act performed or to be performed by such public official, former public official, or person selected to be a public official;
Shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

**4.** 18 U.S.C. § 2 reads:
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

**5.** App. 838a.

A. What I recall about that trip, Mr. Fitzgerald came into my office and he mentioned that he planned to be in Coral Gables on business, and at that time that he planned to take a vacation.

He also mentioned—and this may have been a week or a few days before he left, and he mentioned to me that Mr. Niederberger planned to be there at the same time, and he said something to the effect that, "We will be getting together to play golf, we will be having dinner together," something alone that line. You know, it wasn't a long, lengthy discussion or anything heavy and so I said, "Well, Fitz, if you are doing that, why don't you pick up Mr. Niederberger's expenses?" [6]

Similarly, although the Niederberger jury had returned a not guilty verdict on the § 7214(a)(2) counts regarding Miami Beach and Absecon, Standefer also admitted arranging for these gifts.[7]

▆▆▆ Standefer, therefore, did not premise his defense on a denial of the facts that formed the basis of the government charges. Rather, he contended that the gifts were provided as a matter of friendship, and had no relationship to Niederberger's official duties. But here, too, the defense faced a difficult task. As this Court made clear in *United States v. Niederberger,* neither of the statutes involved in that case obligate the government to prove a specific intent, nor do they require proof of a *quid pro quo.*[8] Standefer, for all practical purposes,[9] confronted the same statutes. To find Standefer guilty here, then, it was not necessary for the jury to find a

specific intent on Standefer's part to bribe Niederberger, nor did it need to find that Standefer or Gulf were in any way benefited by actions taken by Niederberger. All that was required in order to convict Standefer was that the jury conclude that the gifts were given by him for or because of Niederberger's official position, and not solely for reasons of friendship or social purposes.

▆▆▆ The jury's determination in this regard finds substantial support in the record. Although Standefer argued that the trips were given for reasons of friendship, there is no evidence that he ever provided trips for Niederberger prior to his becoming the IRS case manager for the Gulf account or that he has done so since Niederberger left that position. Nor does anything in the record show that Standefer was as generous with corporate funds in giving gifts to any non-business related friends.[10] And it appears that Standefer had no social relationship with Niederberger, other than the contact he had with him in their various official capacities.[11] Moreover, Standefer's immediate subordinate and own witness, Fitzgerald, testified that he did not believe Standefer and Niederberger to be "close personal friends," but that he considered them to be only "business friends."[12] Standefer also regularly submitted, as he was required to do, representation letters to his superiors wherein he stated that all expenditures made or authorized by him, such as the payments for the Niederberger trips, were in the ordinary course of Gulf's busi-

---

6. App. 860a–861a.

7. App. 863a–865a (Miami); App. 869a–872a (Absecon).

8. 580 F.2d at 69. *Accord, United States v. Irwin,* 354 F.2d 192 (2d Cir. 1965), *cert. denied* 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966). 18 U.S.C. § 201(f) may be contrasted with 18 U.S.C. § 201(b), which requires a specific intent to bribe a public official. The penalty for violation of § 201(b) is a fine of up to $20,000 (or three times the amount of the bribe, whichever is greater) or a prison term of up to fifteen years, or both, and possible disqualification from future office. In contrast, the penalty for violation of § 201(f), under which Stande-

fer has been convicted, is a fine of up to $10,000 or a prison term of two years, or both. *See* 18 U.S.C. § 201.

9. Niederberger, of course, was charged with violating § 201(g), not § 201(f). The sections are companion provisions, however, and do not vary in regard to the intent required or the need to demonstrate a *quid pro quo.*

10. *See, e. g.,* App. 688a–694a; App. 775a–776a; Supp. App. 42b–45b.

11. App. 207a–209a.

12. App. 687a.

ness, and that there was an "expectation that Gulf (would) benefit directly or indirectly" from such expenditures.[13] Most tellingly, Standefer himself, at one point, stated that the purpose of his expenditures was "to establish rapport" with the IRS:

Q. What did you understand your duties to be on connection with the policies of Gulf Oil as to IRS agents?

A. Well, it was—My understanding is that I was to develop a rapport; and as a matter of fact, and when I first came into Pittsburgh, I had not made this arrangement, but within a month there was a joint party between the Gulf people and the IRS; and even though we were having all the friction at that point, I observed that it seemed that the people could get out on the golf course and realize that maybe the other ones weren't —didn't have horns, and it seemed to improve communications and rapport.

Q. Did you continue that policy?

A. Yes, sir, I did.

. . . . .

Q. What did you consider those expenditures [the vacations provided to Niederberger by Gulf] to be, sir?

A. It was to establish a rapport to relieve tension that built up on one of these big audits. No one can imagine how difficult these audits are, both on the IRS as well as Gulf. It is a terrible, terrible procedure to go through.[14]

Accordingly, there was ample, perhaps even overwhelming, evidence in the record to support the jury's finding that the gifts Standefer made to Niederberger were not provided solely for social reasons.

On appeal to this Court Standefer has urged, *inter alia*, that three of the § 7214(a)(2) counts—those based on the trips to Pompano Beach, Miami, and Absecon—should have been dismissed because of

Niederberger's acquittal on practically identical charges. Specifically, Standefer argues that as a matter of law he cannot be convicted of aiding and abetting a principal when that principal has been acquitted of committing the charged offense. A divided panel rejected this argument, relying on past decisions of this Court that have permitted the conviction of an aider and abettor even when the principal has been acquitted. *See United States v. Bryan,* 483 F.2d 88 (3d Cir. 1973) (en banc); *United States v. Provenzano,* 334 F.2d 678, 691 (3d Cir.), *cert. denied,* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964); *United States v. Klass,* 166 F.2d 373 (3d Cir. 1948). The Court ordered rehearing *in banc* in order to reconsider its position in these cases and to re-examine the law in this area.

## II. THE STATUS OF AIDERS AND ABETTORS UNDER FEDERAL LAW.

The primary issue facing the Court at this juncture, and the one that the Court *in banc* requested counsel to address, is whether an aider and abettor may be convicted notwithstanding the acquittal of the principal he is charged with aiding and abetting.

At common law, the prevailing rule was that an accessory to a crime could not be convicted unless and until the principal whom he had assisted had been convicted of committing the substantive offense.[15] If the principal were to escape, or to die, or never brought to trial, or tried and acquitted, no charges could be brought against any accessories charged with assisting him. Federal law, of course, has no common law crimes, and until 1909 an accessory to a felony could not be tried at all absent an express statutory authorization making the aiding of the principal committing that crime a crime in and of itself.[16] A nine-

---

13. Supp. App. 124b–125b; Supp. App. 157b–158b.

14. App. 837a–838a.

15. The prevailing rule, it should be noted, was not uncritically or universally accepted. *See, e.*

*g., Regina v. Wallis,* 1 Salk. 334, 91 Eng. Rep. 294 (1703).

16. The rule as to misdemeanors differed, however. No specific statutory authorization was necessary to prosecute an accomplice, and aiders and abettors were chargeable as principals.

teenth century federal prosecution for aiding and abetting thus required a specific "accessory provision," and several such provisions were included among the criminal statutes of the period.[17] In 1909, however, Congress altered this system by enacting a general rule:

Whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces or procures its commission, is a principal.[18]

It has long been the position of most courts and commentators that, as the Court of Appeals for the Ninth Circuit put it four years after the statute was passed:

The effect of the section under consideration is to abolish the distinction between principals and accessories in offenses defined in the laws of the United States . . . . [T]he section under consideration is a recognition by Congress that the old distinction between principals and accessories which pertained to felonies is generally abrogated, and that a charge against one formerly known as an accessory is good against him as principal.[19]

This statute, which is now codified, with some changes, at 18 U.S.C. § 2(a), rejects any distinction between a principal and an aider and abettor. Consequently, the issue presented here is more accurately phrased in terms of whether a jury's finding as to one "principal" should affect the outcome of charges brought against another "principal" involved in the same crime—that is, whether the doctrine of non-mutual collateral estoppel does or should prevail at federal criminal law. But before this issue is considered, it is necessary to discuss certain questions that have arisen in regard to the meaning of 18 U.S.C. § 2, despite the gener-

al acceptance accorded the interpretation set out above.

### A. The Congressional Intent in Drafting 18 U.S.C. § 2.

■ A critical question raised in the course of the Court's in banc consideration of this case is whether the original aider and abettor statute of 1909 was intended by its drafters to be as broad as this and other courts have assumed over the last seventy years. In particular, the claim has been made, in Part IV A of the concurring and dissenting opinion by Judge Aldisert, infra, that Congress never anticipated the use of 18 U.S.C. § 2 to allow the conviction of an aider and abettor after the principal has been acquitted.

This contention is premised on the absence of any expression of an affirmative intent on the part of Congress to bring about such a result. Implicit in such an argument is the concession that the language of the statute states a general rule encompassing the facts of any aider and abettor case, including one where the principal has been acquitted. Despite this concession, the argument seeks to exonerate Standefer by stressing that nowhere in the legislative history did Congress unequivocally state its desire to permit the conviction of an aider and abettor once a principal has been acquitted. The solitary support for this argument is one passage of the legislative history. In the Senate Report on the Act of March 4, 1909, a Senate committee expressed its view regarding the purpose of the proposed legislation:

The committee has deemed it wise to make those who are accessories before the fact at common law principal offenders, thereby permitting their indictment and conviction for a substantive offense.

See *United States v. Mills*, 32 U.S. (7 Pet.) 138, 141, 8 L.Ed. 636 (1833).

**17.** *See, e. g.,* Act of March 3, 1825, ch. 64, § 45, 4 Stat. 114 (buying stolen mail); R.S. § 5323 (1878) (privacy); R.S. § 5427 (1878) (naturalization offenses); R.S. § 5466 (1878) (destroying mail).

**18.** Act of March 4, 1909, ch. 321, 35 Stat. 1152. This provision became § 332 of the penal code,

and is presently codified, with some modifications, at 18 U.S.C. § 2(a).

**19.** *Rooney v. United States,* 203 F. 928, 932 (9th Cir. 1913). This view has been adopted by the majority of the courts of appeals, *see* cases gathered in note 31, *infra.* It is also the view taken by the Model Penal Code, Section 2.06(7).

At common law an accessory cannot be tried without his consent before the conviction or outlawry of the principal except where the principal and the accessory are tried together; if the principal could not be found or if he had been indicted and refused to plead, had been pardoned or dies before conviction, the accessory could not be tried at all. This change of the existing law renders these obstacles to justice impossible.[20]

Although the Senate Committee did not, in either the quoted passage or elsewhere, express an intention to make any exception to the general rule announced in the statute itself, namely that an aider and abettor is to be treated as a principal, it is asserted that the Senate, at least, envisioned reaching only certain "obstacles to justice" which are clearly set out in the Committee's notes. The argument proceeds that inasmuch as the situation at issue in this case—where the principal has been acquitted—is one of the more obvious possibilities that might arise in aider and abettor cases and is not adverted to in the report, a doubt arises whether the prior law was intended to be altered in this regard. Such a doubt, it is then asserted, must, under traditional rules of statutory construction, be resolved in favor of a criminal defendant and against the government.

We are unpersuaded that this approach yields a proper interpretation of 18 U.S.C. § 2(a). The limited exception contended for by our colleagues does not appear in the language of the statute nor is it at any time specifically endorsed in the legislative history. Further, in the more than seventy years since the passage of the statute no court or commentator has ever suggested, even in passing, that the Congress sought to create or retain such a remnant of the common law rule. The entire argument is premised on the fact that a committee did not affirmatively set down, in a particular report, its intention to reach this precise class of cases.

It is true that the Supreme Court has recently employed a somewhat analogous formulation in requiring an affirmative expression of intent from Congress before it would read the facially applicable National Labor Relations Act to include in its scope parochial school teachers.[21] But that opinion, as well as the approach employed therein, was expressly motivated by the salutary and longstanding rule that a court is obligated, wherever possible, to avoid a construction that might raise a constitutional issue. See e. g., The Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804). Even so, the parochial school decision drew a sharp dissent from four Justices who were unwilling to allow the absence of an affirmative expression of intent in the legislative history to alter the clear language of the statute,[22] even when a constitutional issue is implicated. In cases such as this one, where no constitutional concern is present, the insistence on such an affirmative expression of intent in the course of legislative hearings or in the body of a legislative report would more likely have the effect of undermining congressional authority rather than respecting Congress' desires.

The Act of March 4, 1909 is clear on its face. Both those who commit crimes and those who aid and abet their commission are placed in a single class: "principals."

20. S.Rep. No. 10, pt. 1, 60th Cong., 1st Sess. 26 (1908).
We note that neither Standefer nor the government has adverted to this Senate Report at any time in the course of this case, either before the district court, or before the original panel of this Court, or before the Court sitting *in banc.*

21. *National Labor Relations Board v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979).

22. The Court requires that there be a "clear expression of an affirmative intention of Congress" before it will bring within the coverage of a broadly worded regulatory statute certain persons whose coverage might raise constitutional questions. *Ante,* at 1320. But those familiar with the legislative process know that explicit expressions of congressional intent in such broadly inclusive statutes are not commonplace. Thus, by strictly or loosely applying its requirement, the Court can virtually remake congressional enactments.
440 U.S. 490, 502, 99 S.Ct. 1313, 1320, 59 L.Ed.2d 533 (Brennan, J., dissenting).

The statutory language does not admit to any other possibility, for the transformation from the common law rule appears to be both general and complete, there being no exceptions provided for in the statute itself. It is undeniable, of course, that courts no longer exclude evidence of the legislature's intent on the ground that the meaning of the words of a statute is plain. But neither do courts, in seeking to ascertain the purpose of a piece of legislation, disregard the words chosen by the legislature. "Illogical though it was to hold that a 'plain meaning' shut off access to the very materials that might show it not to have been plain at all, it was equally wrong to deny the natural meaning of language its proper primacy; . . . ."[23] Here the words chosen by the Congress express a general rule. Equally important, however, the legislative history itself announces a desire for general application. The very Senate Report that is relied upon to raise the question of legislative intent states unequivocally that the relevant section, along with another covering accessories after the fact, "are new only in the sense that they are made general in their application. They explain themselves."[24]

Moreover, even as to the passage giving reasons for the change, set forth in full *supra,* there is no explicit intention expressed to create the exception contended for in Standefer's behalf. Although the Senate Report lists the elimination of certain "obstacles to justice" in support of the proposed statute, there is absolutely no indication that the list purported to be all inclusive. In fact, such an assumption would, in effect, apply the canon of statutory interpretation known as *expressio unius, exclusio alterius* not to the words of the statute but to the language employed in a committee report.[25] Our attention has been called to no instance where this approach to statutory construction has been applied; indeed, many general Congressional enactments would be seriously limited by such an interpretation. In proposing general rules congressional committees need not be expected to anticipate every possible application of the contemplated rule, nor to voice their desire to bring about all the applications they do foresee. An insistence on an affirmative expression of intent would require just such a clairvoyant legislative report and would bring many general enactments under scrutiny. Such a demanding reading of legislative history is not, in our view, in the best interests of the legislative process.

It also bears emphasizing that the statute at issue is now over seventy years old and at no time in the period since its enactment has any court or commentator adverted to this Senate Report to demonstrate that Congress' intent was being ignored. Moreover, on several occasions since 1909 Congress has had the opportunity to reform the criminal code, and, indeed, is in the process of doing so now. Yet, Congress has never sought to alter 18 U.S.C. § 2 to create the exception Judge Aldisert claims it had in mind in 1909; and this despite several cases in the federal courts giving the statute its natural meaning. Although at times it may be proper to reconsider an interpretation of

---

23. H. Friendly, Benchmarks 206 (1967).

24. S.Rep. No. 10, pt. 1, 60th Cong. 1st Sess. 26 (1908).

25. Another less drastic approach would be to apply a different canon of statutory interpretation, *ejusdem generis,* to the words of the Senate Report. Under this doctrine, once a statute lists items of one type, any other items are to be included only if they are of the same type. Thus the list of "obstacles to justice" found in the Senate Report would not necessarily be all inclusive since other "obstacles to justice" not included therein would be deemed within the legislative intent. But the application of *ejusdem generis* to legislative history, rather than the statute itself, is as unprecedented as the application of *expressio unius, exclusio alterius* would be. Moreover, the Senate Report contains no words of inclusion, such as "and other such obstacles" which are usually necessary to invoke *ejusdem generis* rather than *expressio unius, exclusio alterius*—even assuming that canons of statutory interpretation may be applied to legislative history. Finally, even if *ejusdem generis* were applicable, the question would remain whether an outright bar to prosecution of an aider and abettor after the principal is acquitted may properly be described as an "obstacle to justice."

a statute in light of new evidence of congressional intent, we believe that long standing interpretations of statutory language and purpose should not be lightly overturned if the law is to have any certainty and consistency.

In sum, we are not persuaded that an objective reading of the statute and its legislative history can be said to leave a doubt as to the general nature of the rule clearly enunciated therein. There is thus no basis for construing such a doubt in Standefer's favor. As Mr. Justice Frankfurter noted in *Callanan v. United States*, 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961):

> Petitioner invokes 'the rule of lenity' for decision in this case. But that 'rule', as is true of any guide to statutory construction, only serves as an aid for resolving an ambiguity; it is not to be used to beget one. . . . The rule comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers. That is not the function of the judiciary.[26]

We thus reject the view that the Senate Report may be construed to raise a doubt about the general nature of the rule set out in 18 U.S.C. § 2(a).

B. *The Application of 18 U.S.C. § 2 to Convict One Who Could Not Be Charged as a Principal Under the Substantive Criminal Statute.*

A second concern that has been expressed is that the substantive criminal statute under which Standefer was indicted, 26 U.S.C. § 7214(a)(2), is limited in its coverage to officers and employees of the United States. Standefer, a private citizen, notes that the government employed 18 U.S.C. § 2(a) to prosecute him as an aider and abettor, when he could not have been indicted as a principal for the substantive crime. He questions whether Congress anticipated that a statute that ostensibly does no more than alter a prior system of classification would be used to expand the reach of other substantive criminal statutes that are confined to certain classes of defendants by their terms. "Congress could not have intended to amend 26 U.S.C. § 7214(a)(2) to apply to a non-Revenue Service citizen," he asserts. "The substantive offense contained in § 7214(a)(2)," the argument continues, "must be committed by an employee of the Internal Revenue Service."[27]

This point might be somewhat convincing were it not for the 1951 amendment of the Act. But apparently the very question Standefer raised in this regard had arisen prior to 1951, because the Congress, in Section 17B of the Act of October 31, 1951, altered the language of the statute by replacing "is a principal" with "is punishable as a principal." The change was not designed to be purely formal, for Congress expressed its purpose quite clearly:

> This section is intended to clarify and make certain the intent to punish aiders and abettors regardless of the fact that they may be incapable of committing the specific violation which they are charged to have aided and abetted. Some criminal statutes of title 18 are limited in terms to officers and employees of the Government, judges, judicial officers, witnesses, officers or employees or persons connected with national banks or member banks.[28]

In light of this unambiguous statement by Congress that 18 U.S.C. § 2(a) may be used to reach one who could not be indicted as a principal, Standefer, despite his private status, may not be heard to challenge his conviction on this ground. Section 7214(a)(2) is made applicable to Standefer through 18 U.S.C. § 2(a), and he must therefore be judged, in the circumstances of this case, as though he were a principal capable of violating that statute.

---

26. 364 U.S. at 596, 81 S.Ct. at 326.

27. Brief for appellant sur rehearing in banc, at 22.

28. S.Rep. No. 1020, 82nd Cong. 1st Sess., *reprinted in* [1951] U.S.Code Cong. & Admin. Serv., pp. 2578, 2583.

## C. *Precedents Bearing on the Question Whether an Aider and Abettor May Be Convicted When a Principal Has Been Acquitted.*

It is clear that 18 U.S.C. § 2(a) was designed to abolish the common law requirement that any action taken against an aider and abettor is to be conditioned on the prior conviction of the principal. Although there is general agreement that most ele-

ments of this absolute dependency have been abrogated,[29] the idea of allowing the conviction of an aider and abettor when a principal has actually been acquitted still evokes some dissent. At least one court of appeals has persisted in applying the traditional common law bar in such a situation, despite the passage of 18 U.S.C. § 2(a).[30] The clear majority position,[31] however, is the view taken by the Model Penal Code[32] —namely that no such bar exists.[33]

In the *Bernstein* and *Stevison* cases, both involving situations where the principal and the aider and abettor were tried together, the issue was whether it was error for the trial judge to charge the jury that it could not find the aider and abettor guilty without first finding the appellant principal guilty of committing the substantive crime. The challenges were made by principals who contended that such a charge prejudiced them by leading the jury to conclude that it could not convict certain defendants, for whom it may have had little sympathy, without convicting the appellants, for whom it may have had some. In *Stevison*, for instance, the principal's defense had been based on coercion by the aider and abettor and she reasoned on appeal that the jury might well have acquitted her had it been permitted to convict her co-defendant aider and abettor independently.

In both cases the appellate courts rejected the argument tendered by the principals, citing in one case *Shuttlesworth*, and in the other *Giragosian*, both of which are discussed in the text *infra*. The cases would thus appear to stand for no more than the proposition that "a person cannot be found guilty of aiding and abetting unless the principal whom he has aided and abetted committed the criminal act." *Bernstein, supra*, 533 F.2d at 799. These cases might be susceptible to a broader reading, however, because of certain citations and language used. Thus in *Bernstein* the Second Circuit indicated that it believed its rule was contrary to that announced by this Court in *United States v. Bryan*, 483 F.2d 88 (3d Cir. 1973) (*in banc*) and *United States v. Provenzano*, 334 F.2d 678 (3rd Cir.), *cert. denied*, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). (*But see United States v. Deutsch*, 451 F.2d 98, 118–19 (2d Cir. 1971), *cert. denied*, 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972)) (which is in apparent agreement with *Bryan* and *Provenzano*). And in *Stevison* the Court stated: "The presupposition that an aider and abettor may be convicted, since 1951, absent conviction of the principal is invalid." 471 F.2d at 148. Were this language to be given its broadest reading, it would state the common law rule that forbids the conviction of an aider and abettor altogether unless the principal is also convicted, even in cases where the principal died or was not tried.

**29.** No modern court, to our knowledge, has taken the position that an aider and abettor may not be convicted if the principal is for whatever reason never brought to trial. The conviction of a principal is thus no longer a prerequisite to the conviction of an aider and abettor in any jurisdiction of which we are aware.

**30.** *United States v. Shuford*, 454 F.2d 772 (4th Cir. 1971); *United States v. Prince*, 430 F.2d 1324 (4th Cir. 1970).

**31.** *See, e. g., United States v. Deutsch*, 451 F.2d 98, 118–19 (2d Cir. 1971), *cert. denied*, 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972); *United States v. Bryan*, 483 F.2d 88 (3d Cir. 1973) (en banc); *United States v. Musgrave*, 483 F.2d 327, 331–32 (5th Cir. 1973); *Kelly v. United States*, 258 F. 392, 402 (6th Cir.), *cert. denied*, 249 U.S. 616, 39 S.Ct. 391, 63 L.Ed. 803 (1919); *Pigman v. United States*, 407 F.2d 237 (8th Cir. 1969); *United States v. Azadian*, 436 F.2d 81 (9th Cir. 1971); *United States v. Coppola*, 526 F.2d 764, 776 (10th Cir. 1975); *Gray v. United States*, 104 U.S.App.D.C. 153, 260 F.2d 483 (1958).

**32.** An accomplice may be convicted on proof of the commission of the offense and of his complicity therein, *though the person claimed to have committed the offense* has not been prosecuted or convicted or has been convicted of a different offense or degree of offense or has an immunity to prosecution or conviction or *has been acquitted.*
Model Penal Code, Section 2.06(7) (emphasis added).

This view is also favored by most commentators. *See Perkins*, Criminal Law, ch. 6, § 8 (1969); 1 Wharton's Criminal Law and Procedure, § 116 (1957); 21 Am.Jur.2d, Crim. Law, § 128 (1965).

**33.** A scattering of cases may be said to take an ambivalent view or to be susceptible to varying interpretations. *See, e. g., United States v. Bernstein*, 533 F.2d 775, 799 (2d Cir.), *cert. denied*, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976); *United States v. Smith*, 156 U.S. App.D.C. 66, 478 F.2d 976 (1973); *United States v. Stevison*, 471 F.2d 143 (7th Cir. 1972), *cert. denied*, 411 U.S. 950, 93 S.Ct. 1933, 36 L.Ed.2d 411 (1973).

Most, if not all, of the cases urged by Standefer on this point in fact stand for little more than the abiding requirement that the government must prove every element of its case in order to sustain a conviction. This is true of any criminal prosecution, but it has been a particularly notable factor in the reversal of several convictions of aiders and abettors when the government has been unable to establish adequately the commission of the criminal act by the principal. 18 U.S.C. § 2 has not altered the rule that in order to convict an aider and abettor, the government must first demonstrate that a crime has been committed. *See, e. g., United States v. Cades*, 495 F.2d 1166, 1167 (3d Cir. 1974).

Thus in *Shuttlesworth v. City of Birmingham*, 373 U.S. 262, 83 S.Ct. 1130, 10 L.Ed.2d 335 (1963), two ministers charged with aiding protesting students in conducting a "sit-down demonstration" were held not to be subject to conviction on an aiding and abetting charge when the "sit-down demonstration" itself was held not to be criminal under the federal Constitution. The act that they had helped to bring about was simply not a criminal act. In the present case, however, there is no suggestion that the acts charged, if proven, are insufficient to constitute criminal offenses.

A different but perhaps more typical example is *Giragosian v. United States*, 349 F.2d 166 (1st Cir. 1965). In that case the court concluded that there was ample evidence to support the jury finding that Giragosian had aided and abetted a bank official named Page in the misapplication of bank funds—if such an offense could itself be proved. But the court held that the evidence of the actual commission of the substantive offense by Page, the principal, was insufficient to support a guilty verdict, inasmuch as there was no showing of the willfulness necessary to convict Page under the applicable statute. If the government could not prove that there was a substantive criminal violation, it could not secure a verdict against one charged with aiding and abetting that violation.[34]

*Giragosian* and cases like it, it should be added, are not themselves universally accepted. Even when the principal and the aider and abettor are tried together, whether by judge or by jury, a conviction of the aider and abettor may be sustained even if the fact finder concludes that the principal lacked the requisite intent to commit the substantive crime, provided that the act constituting the crime has itself been completed. This has been the rule in this Circuit. *United States v. Bryan*, 483 F.2d 88 (3d Cir. 1973) (in banc). *Bryan* involved an "innocent dupe" who was charged as a principal in the theft of 950 cases of Scotch whiskey. The dupe, Echols, was acquitted because a reasonable doubt existed whether he had the requisite intent to steal the whiskey. No such doubt existed as to Bryan, the aider and abettor, and he was convicted by the same fact finder that acquitted Echols. Although a question was therefore raised whether the commission of the substantive crime charged in the indictment had been proved, *see* 483 F.2d at 97–99 (Gibbons, *Circuit Judge*, dissenting), a majority of this Court allowed the conviction to stand. That case, in fact, appears to present the situation contemplated by 18 U.S.C. § 2(b).

But the collective teachings of *Shuttlesworth, Giragosian, Bryan*, and cases like them, when applied to the case *sub judice*, do not offer much help to Standefer. The

Inasmuch as this is plainly not the law after 18 U.S.C. § 2, we do not think that the court intended so broad a statement, or to go beyond the cases cited in support of its holding.

The third arguably ambivalent case, *Smith*, also involved defendants who were tried together. The conviction of the principal, Smith, was overturned because the prosecutor threatened a witness, ultimately depriving both defendants of his testimony. The case appears to stand for the proposition that "error that damaged Smith's defense was also prejudicial to Jarvis," the aider and abettor, thus requiring the reversal of both verdicts. The opinion does not therefore appear to signal a rejection by that court of the position it took in *Gray v. United States*, 104 U.S.App.D.C. 153, 260 F.2d 483 (1958).

**34.** *Accord, United States v. Hoffa*, 349 F.2d 20, 40 (6th Cir. 1965).

crime charged here is not constitutionally protected or otherwise innocent activity as was the case in *Shuttlesworth*. Moreover, the theoretical difficulties presented by *Bryan* and *Giragosian* are not present here, where the evidence offered by the government to prove the commission of the substantive crime was more than adequate. In *Bryan* the evidence established that the named principal did not commit the substantive offense. In *Giragosian* the evidence was insufficient as a matter of law to permit a jury to find that the substantive offense was in fact completed. Here, in contrast, the evidence produced at Standefer's trial left little doubt that the substantive crime was committed, and by Niederberger. Standefer himself admitted that all the vacations listed in the indictment were provided to Niederberger and paid for by Gulf,[35] and the record clearly supported a finding of the requisite business relationship.[36] Accordingly, Standefer can find no comfort in those precedents requiring adequate proof of the fact of a substantive criminal act. He must prevail, if at all, on the theory that the previous determination of the Niederberger jury is in some way binding on his own jury.

D. *The Justification for Permitting the Conviction of an Aider and Abettor When the Principal Has Been Acquitted.*

■ As we have suggested above, the rule that one jury's determination as to a principal forecloses a second jury's determination as to an aider and abettor—as opposed to the rule requiring proof of the

commission of a criminal act—is endorsed by only one court of appeals. In *United States v. Prince*, 430 F.2d 1324 (4th Cir. 1970), the Fourth Circuit concluded that the acquittal of Prince's hunting companion on a charge of shooting a rail bird from a motorboat conclusively established that no crime had been committed, and therefore required reversal of Prince's separate conviction for aiding and abetting his friend by operating the motorboat. Were we to apply *Prince* to the present case, we would have to conclude that Niederberger's acquittal on three of the § 7214(a)(2) charges establishes as a matter of law that no substantive crime was committed as to the offenses charged in those counts, and thus bars a contrary finding by the Standefer jury.

The superficial attractiveness of this approach is readily apparent. The problem of allowing two seemingly inconsistent verdicts to survive is naturally troubling, and a rule of law that eliminates such apparently contradictory results is, therefore, not without appeal. Moreover, in the criminal context, the government's success in securing a guilty verdict against an aider and abettor after failing to secure such a verdict against a principal may strike some as giving the prosecution "two bites at the apple" and therefore as bordering on unfairness.

But even if it is easy to understand the temptation to retain at least this one aspect of the common law rule, we do not believe that Congress has done so,[37] and the reasons for not doing so are, on balance, persuasive. First, as a logical matter, the barring of the

---

**35.** *See* text accompanying notes 5–7.

We cannot agree, however, with the position taken by Judge Aldisert in Part III of his concurring and dissenting opinion to the effect that "it is precisely because" of Standefer's admissions that "Niederberger's acquittal can only be interpreted as a jury finding that receipt of the vacations in question was an innocent act." Standefer's admissions were not made until his own trial, well after Niederberger had been convicted. Standefer made no admissions—indeed he did not testify—at Niederberger's trial. Thus whatever interpretation one may choose to give to the findings of the Niederberger jury—if indeed it is appropriate to interpret them at all—such an interpretation ought not to be

based on statements made by Standefer long after the Niederberger jury delivered its verdict.

**36.** *See* text accompanying notes 8–14.

**37.** As is elaborated upon in our discussion of the original purpose of 18 U.S.C. § 2, *see* Part IIA *supra*, it is our view that that statute states a general rule abrogating in its entirety the common law distinction between principal and accessory before the fact. Of course, an aider and abettor is not deprived of the benefit of other rules of law, applicable to all principals, if such rules offer him protection. *See* Part III *infra*.

prosecution of an aider and abettor when the principal is acquitted would at times spawn its own inconsistencies. An example may be drawn from the present case. Were it beyond question, for instance, that the Niederberger jury must have entertained a doubt that Gulf Oil money was used to pay Niederberger's hotel bill, in Pompano Beach—the one vacation for which Niederberger was not convicted under any statute—we would be required to accept as a fact an arguable jury conclusion that all the parties now before us concede to be false.[38]

■ Nor do we believe that this type of conundrum would be all that unusual in cases where aiders and abettors are tried separately from the principals that committed the crime. It will surely come as no surprise that in many cases the proof available to the government may vary depending on who is being prosecuted and when the prosecution is brought. Evidence inadmissible against one defendant may often be used against another. For example, differing defense strategies may result in different rulings on admissibility under the Federal Rules of Evidence [39] or, as was the case here, different witnesses and different emphasis in testimony. Similarly, one defendant may lack standing to challenge the admissibility of evidence unconstitutionally obtained from a co-defendant, and there-fore inadmissible against the co-defendant but admissible against him.[40] And if there is a substantial time difference between the trials of the defendants, a key witness at the first trial may die or be missing at the time of the second trial, or conversely, new evidence may be obtained against the second defendant that was either unknown or unavailable to the prosecution at the time of the first trial.[41] In short, it may not comport with the realities of criminal trials to require two juries who are presented with different records to reach the same conclusion. To insist upon an absolute congruence of results would leave many courts in the uncomfortable position of reversing findings of fact supported by overwhelming evidence because a different fact finder entertained a reasonable doubt when confronted with a much less extensive or persuasive record.

Just as logic does not dictate such a result, neither does fairness. Despite any assertion to the contrary, the government does not get "two bites at the apple" under the majority rule set forth in the Model Penal Code. The defendant, however, does get such an advantage under the modified common law rule that is urged upon us here. The double jeopardy clause of the federal constitution prohibits the government from retrying a defendant after he

**38.** This hypothetical example is given only as an illustration. In fact, several inferences might be drawn from the verdict rendered by the Niederberger jury. We cannot say with any certainty what may have motivated its apparently contradictory conclusions. Its verdict may be read to indicate doubt as to certain facts, or confusion on legal standards or have been the result of compromise or compassion. Whatever may have been at the root of the Niederberger jury's conclusions, we do not believe that the district court trying Standefer was required to seek to rationalize that result or that it was or should have been controlling on the considerations of the Standefer jury.

**39.** Very often a defendant's decision to testify will present opportunities to the government to offer evidence that might not otherwise be admissible. Should a defendant make a general denial of bribe-taking, for instance, the prosecution may succeed, by way of rebuttal, in introducing evidence of bribes other than those charged in the indictment. Such evidence of prior bad acts would normally be excluded under Fed.R.Evid. 404(b).

**40.** Thus, a defendant normally has standing to raise violations of his own constitutional rights, but no standing to raise those of others. *Alderman v. United States*, 394 U.S. 165, 171–72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). In certain cases, then, unconstitutionally seized evidence may be admissible against a defendant who had no possessory or privacy interest in the place searched or the goods seized, but not against another who had such an interest. *See, e. g., Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). *Cf. United States v. Azadian*, 436 F.2d 81 (9th Cir. 1971) (defendant's entrapment defense not vicariously available to co-defendant who was not entrapped).

**41.** This latter possibility was the case in *United States v. Musgrave*, 483 F.2d 327 (5th Cir. 1973).

has been acquitted, and thus makes "two bites" at the same apple impossible. A rule forbidding the prosecution of an aider and abettor once a principal is acquitted, on the other hand, would allow the aider and abettor the opportunity to prevail in either one of two trials. No matter how strong the evidence against him at his own trial, he could always hope to be acquitted vicariously as a result of some fortuitous development at the principal's trial. Of course, the government cannot benefit from any developments at the other trial, and the suggestion that the defendant at the second trial might therefore be properly convicted vicariously as a result of the findings of a different fact finder would be universally rejected out of hand. The aider and abettor is thus provided with a second trial, at which he is not put in jeopardy, and from which he can only benefit.

But even if this "windfall" aspect of the common law rule is considered tolerable, the application of a bar to conviction in these cases would cause many guilty defendants to go free without serving any countervailing purpose. For instance, in *United States v. Azadian,* 436 F.2d 81 (9th Cir. 1971), the principal, a Miss Daniel, was acquitted of charges of soliciting or receiving bribes in return for altering selective service classifications. Her conviction was impermissible because the government had entrapped her through the use of an agent. The government, however, had not entrapped her accomplice Azadian, who was indicted as an aider and abettor because he was a private citizen and could not be indicted on the substantive statute that applied only to government officials. The Court of Appeals for the Ninth Circuit saw no reason to extend to him Miss Daniel's constitutional protection against entrapment when Azadian himself was clearly not entrapped.

Similarly, in *United States v. Musgrave,* 483 F.2d 327 (5th Cir. 1973), the government's evidence against the principal, one Bryant, was insufficient to convict him at his trial and he was acquitted. Thereafter, new evidence was uncovered which could have allowed a jury to convict Bryant of the charged offense—bank fraud. Although it was unable to proceed against Bryant because of the fifth amendment's double jeopardy bar, the government did secure the conviction of two aiders and abettors, Musgrave and Womack. The Court of Appeals for the Fifth Circuit declined to offer these defendants relief from a factually supported verdict merely because Bryant himself was protected against retrial.

Neither fairness nor justice argue for allowing these aiders and abettors to escape responsibility for their criminal activity merely because their respective principals have escaped punishment. The criminal law abounds with rules that often require that the guilty go free in order to safeguard the individual rights and liberties of our citizens. Thus, damning evidence obtained through an illegal search will be excluded from a trial so as to protect the rights of the defendant to be free from an unreasonable search and seizure, even if the result might be said to be a miscarriage of justice in the individual case. In like manner, a confession will be held to be inadmissible if certain warnings are not given and the defendant's fifth and sixth amendment rights are not thereby protected. Convictions will be reversed, as well, for a host of trial errors too numerous to list in order that the principles of fair trial and due process not be encroached upon, even when the actual involvement of a criminal defendant in the crime charged is not in doubt. Although these rules are often unpopular, and sometimes misunderstood, the price that they extract from society by leaving many of the guilty unpunished, and free to repeat their transgressions, has been thought to be worth the benefits obtained in the protection of human liberty.

■ But Standefer, like Azadian and Musgrave, has suffered no encroachment on his liberty. He has had a full and fair trial before a jury of his peers; he has been represented throughout by able and resourceful counsel; no unconstitutionally seized evidence or coerced confession has

been admitted against him; and his due process rights have been fully safeguarded. Yet, despite all of this, it is proposed to give him refuge in the imagined remnant of a common law rule regarding the dependency of verdicts against aiders and abettors. Such a result might please those who pursue a tidy consistency for its own sake, but it would have no relationship to either the facts of this case or to a policy that seeks to promote individual liberty. It would serve no purpose, save the maintenance of a common law system of criminal classification and the fulfillment of the scholastic quiddities of the more traditional of our legal academics. We believe this Court has been correct in rejecting such an approach over the last thirty years, and we decline to accept it now. 18 U.S.C. § 2, the majority of the cases, and the Model Penal Code, all take the view that an aider and abettor should be treated like any other principal, and be required to "stand on his own two feet." [42] We see no occasion at this time, and on these facts, to alter this stance.

## III. THE APPLICATION OF NON–MUTUAL COLLATERAL ESTOPPEL IN A CRIMINAL PROSECUTION.

The conclusion that we have reached in regard to 18 U.S.C. § 2 may be summarized briefly: that statute transforms the aider and abettor into a principal, abrogating any special status afforded to the former under the common law. This determination, however, does not completely resolve Standefer's appeal. For even if we were to treat Standefer as we would any other principal, it may be argued that the prior findings of the Niederberger jury should, as a matter of collateral estoppel, bar contradictory findings by the Standefer jury.

This argument is distinct from the aider and abettor issue because such a rule would not be dependent on Standefer's status as an aider and abettor, but would reflect a general policy decision to forbid the relitigation of questions already decided against the government at a prior trial, even though Standefer was not a party at the earlier trial. It is a somewhat novel argument because collateral estoppel has not been thought to apply in criminal cases when the "same parties" are not before the court.[43] Perhaps because of this, the contention does not appear to have been pressed below, nor was it fully briefed by the parties either before the original panel or before the Court *in banc.* Inasmuch as it is contrary to the policy of appellate courts to consider legal theories not of constitutional magnitude neither presented to the trial judge nor fully argued on appeal, we are reluctant to undertake an examination of this issue at this time. Nevertheless, given the arguably close relationship between collateral estoppel and the aider and abettor question already addressed, and given the interest expressed in this theory by some of our colleagues at oral argument, we are constrained to discuss this contention, although we do so with some diffidence.[44]

---

**42.** "Each participant in an illegal venture is required to 'stand on his own two feet.'" *United States v. Provenzano,* 334 F.2d 678, 691 (3d Cir.), *cert. denied,* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964).

**43.** *Cf. Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970) (emphasis supplied):

Collateral estoppel is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated *between the same parties* in any future lawsuit.

**44.** Judge Gibbons has expressed the view, in his opinion concurring in part, and dissenting in part at 66, that before trial "Standefer did come forward and put in issue the estoppel effect of Niederberger's acquittal on several counts." The contention referred to reads:

Counts One, Three and Five of the indictment should be dismissed *since the alleged principal has already been acquitted* of the same charges. (emphasis added).

Under this heading the facts are set out in eight numbered paragraphs. The ninth paragraph then states:

Since Cyril J. Niederberger has been acquitted of receiving said funds and Cyril J. Niederberger is *the only named principal,* this defendant cannot, as a matter of law, be found guilty *as an aider and abettor,* since a

 Of course, the traditional elements of collateral estoppel are constitutionally mandated in criminal cases. Thus, the double jeopardy clause of the fifth amendment prohibits the government from trying a defendant twice for the same crime. Moreover, that constitutional provision has been applied to protect an individual who has been tried and acquitted of one crime from having to relitigate, at a subsequent trial on different charges, issues decided in his favor at his first trial. *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). The justification for such an application grows out of the fifth amendment itself, which has as one of its objectives the protection of citizens from repetitive and harassing lawsuits brought by the government. Accordingly, the prosecution may not seek, through the device of separate trials on each count brought against a particular defendant, to repeat litigating the same basic issues until it is ultimately successful.

 It is quite another matter, however, to suggest that this well-established policy against harassment of an individual may be invoked by one who, like Standefer, has never been put in any form of jeopardy. Within the past year, in fact, this Court has ruled that, absent mutuality of parties, the application of collateral estoppel in a criminal context is not mandated by the federal Constitution. *Hubbard v. Hatrak,* 588 F.2d 414 (3d Cir. 1978). Nor are we aware of any federal statute or common law tradition that would require our adopting such a rule in this case. But the apparent novelty of such an approach does not necessarily make it inappropriate or unwise. If non-mutual collateral estoppel would improve the criminal justice system, further important public policies, or afforded needed pro-

tection for defendants' rights, we might be persuaded to embrace it as a matter of federal common law. Our analysis of the facts of this case does not convince us, however, that general application of the proposed rule would have such a salutary effect. Indeed, we are inclined to believe that its application to cases similar to this one would, on balance, have a negative impact on the administration of criminal justice.

In civil cases, the reasons advanced for applying collateral estoppel are relatively straight-forward. It is thought that the application of the principle will (1) promote judicial economy by minimizing repetitive litigation; (2) prevent inconsistent judgments that might undermine the integrity of the judicial system; and (3) bar the harassment of a defendant through repetitious and vexatious litigation.[45] The initial inquiry in our consideration of the desirability of collateral estoppel is the criminal context must be whether these purposes are equally well served in the criminal sphere. As has often been noted, the last of these reasons—harassment—should be given weight in the criminal area where the strain on a defendant and the disparity between the parties is at its greatest.[46] But a criminal defendant *is* already protected from repetitious and harassing litigation by the double jeopardy clause. Moreover, in that the proposition now being pressed on the Court is the desirability of non-mutual collateral estoppel, harassment is not at all a relevant concern, since the defendant would be permitted to apply that principle despite the fact that he has never been tried before. Accordingly, this reason for collateral estoppel, compelling in cases such as *Ashe v. Swenson, supra,* where the de-

jury has already found no violation of 26 U.S.C. § 7214(a)(2) *by the principal.* (emphasis added).

This contention would appear to do no more than raise the aider and abettor issue discussed in Part II above, and there is no indication in the transcript, nor did the parties argue on appeal, that it raised the issue of non-mutual collateral estoppel. Thus, although we address this question because it is pressed on us by one

of our colleagues, we express doubt whether the issue can fairly be said to have been raised below or preserved on appeal.

**45.** *See generally People v. Taylor,* 12 Cal.3d 686, 117 Cal.Rptr. 70, 527 P.2d 622 (1974).

**46.** *E. g.,* Mayers & Yarborough, *Bis Vexari: New Trials and Successive Prosecutions,* 74 Harv.L.Rev. 1, 32 (1960).

fendant seeks to bar relitigation against himself of issues resolved in his favor at a previous trial, is of little force in cases such as the present one, where the defendant is being tried for the first time.

The judicial economy concern, although it is not to be minimized, is also, in our view, less persuasive in the criminal context than in the civil context. The primary purpose of a civil court is to allow private parties to resolve matters between them in an orderly, fair and non-violent manner. Once a party has been afforded a full and fair opportunity to litigate a question, considerations of judicial economy have been found to predominate as a matter of public policy, even over the risk that a previous incorrect verdict may bar a meritorious claim in an individual case.[47] This result has been rationalized on the ground that while the public itself has no overriding interest in the outcome of a particular civil trial, it does have a legitimate concern in avoiding repetitive litigation.[48]

In contrast, the purpose of a criminal court is not to provide a forum for the ascertainment of private rights. Rather it is to vindicate the public interest in the enforcement of the criminal law while at the same time safeguarding the rights of the individual defendant. The public interest in the accuracy and justice of criminal results is greater than the concern for judicial economy professed in civil cases and we are thus inclined to reject, at least as a general matter, a rule that would spread the effect of an erroneous acquittal to all those who participated in a particular criminal transaction. To plead crowded dockets as an excuse for not trying criminal defend-

ants is in our view neither in the best interest of the courts, nor the public.

Just as was the case in our evaluation of the status of aiders and abettors, therefore, one of the most troubling points in considering the application of non-mutual collateral estoppel is the desirability of consistency of verdicts. We agree that confidence in the integrity of the criminal justice system is, to some extent, diminished when one criminal escapes punishment while another—particularly one charged as a result of acts performed by the acquitted defendant—is convicted and sentenced. But, unlike Judge Gibbons, we do not believe the "appearance of evenhandedness" is so overriding a concern that it should, as a general matter, warrant the same type of protection as is mandated by the Constitution. To transfer, virtually untouched a rule fashioned for the protection of an individual defendant's constitutional rights to a class of cases unrelated to the double jeopardy concern that motivated it, would be to extend the rule not to the limits of its logic, but beyond those limits.

We do not believe that the perception of evenhandedness would itself justify, except in the unusual case, the transference of civil non-mutual collateral estoppel to the criminal sphere. To forge another bar to prosecution, when the constitutional rights of the defendant are not even arguably implicated, is both unnecessary and unwise. Indeed, it may be that the loss of confidence that might occur from such a rule, as well as the loss implicit in any judicial decision not to pursue the truth-determining process, would outweigh any gain in the appearance of evenhandedness.[49]

---

47. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Blonder-Tongue Laboratories v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *Bruszewski v. United States*, 181 F.2d 419 (3d Cir. 1950); *Bernhard v. Bank of America Nat'l Trust & Savings Ass'n*, 19 Cal.2d 807, 122 P.2d 892 (1942).

48. Of course, some civil litigation, such as actions brought to enforce antitrust or antidiscrimination laws, is of consequence to the general public and not merely the parties to the litigation. With respect to this type of litiga-

tion, implementation of substantive policies, in addition to concerns with judicial economy, may influence the effect given to non-mutual collateral estoppel. *Cf.* 15 U.S.C. § 16(a) (Clayton Act judgment obtained by United States that the defendant has violated antitrust laws shall be prima facie evidence against defendant in any later private action).

49. As the Court of Special Appeals of Maryland recently observed:

To acquit where guilt is confessed or conclusively proven solely to effect a "logical con-

As noted in our earlier discussion,[50] a large number of acquittals result from the enforcement of evidentiary and constitutional rules that prohibit the prosecution from proving as much as it might were it completely unfettered. These rules may be considered by some to obstruct justice because they often result in the frustration of the public's interest in the enforcement of the criminal law. But such results are accepted for good and understandable reasons. General application of non-mutual collateral estoppel, however, would serve to expand the effect of such acquittals to all confederates and accomplices, even when the good and understandable reasons do not apply in their cases, and no public policy would be served thereby.[51] The result would be an increase in the number of transgressors who are released, and an un-derstandable reluctance on the part of the government to try co-defendants separately.[52]

Still another result could be the refusal by the government to prosecute some co-defendants at all for fear of jeopardizing stronger cases yet to be tried, or convictions already obtained. Judge Gibbons declines to give the proposed doctrine retroactive effect, notwithstanding an expressed concern for the "appearance of evenhandedness." Of course, the perceived inequity of inconsistent results is undiminished by the order in which such results are obtained. There is no logical reason why a verdict of acquittal as to A should inure to the benefit of B, who is awaiting trial, but that a verdict of acquittal as to B should not inure to the benefit of A, who has already been convicted.[53] But if the doctrine is to be

---

sistency" pits logic against common sense and permits the latter to fall.
*Gardner v. State,* 41 Md.App. 177, 396 A.2d 303, 311 (Ct.Sp.App.1979). Like the Maryland court we are unpersuaded by the argument that the public will be more shocked by a lack of consistency than by a lack of common sense in criminal cases.

**50.** *See* part IID *supra.*

**51.** Section 88 of Tentative Draft No. 3 of Restatement (Second) of Judgments recognizes that the application of non-mutual collateral estoppel may be inappropriate because of circumstances peculiar to the first litigation. *See id.* § 88(1), (8). Thus, any application of non-mutual collateral estoppel in criminal cases would require consideration of whether the government had a full and fair opportunity to litigate in the first proceedings those issues which it seeks to relitigate in the subsequent prosecution of another defendant.

But as Judge Gibbons notes, it is unclear whether the application of the exclusionary rule to bar the admission of unlawfully seized evidence in one case will constitute the deprivation of a "full and fair opportunity" to litigate a question. If it does not amount to such a deprivation, the application of non-mutual collateral estoppel to the criminal sphere might have the effect of undermining *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) inasmuch as a defendant whose rights were not violated would have the benefit of rulings as to a defendant whose rights were violated. Again no constitutional policy would be served by such a rule—only the appearance of evenhandedness.

**52.** As Judge Gibbons observed in *Hubbard v. Hatrak, supra,* prosecutors would understandably be reluctant to be so solicitous to a defendant's right to a separate trial under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), if everything decided adversely to the prosecution in one trial is held to preclude litigation in the other.

**53.** Judge Gibbons points to the "finality of judgments" as the countervailing policy justifying his abandonment of the "appearance of evenhandedness" in cases where an inconsistent acquittal follows a conviction. He suggests that the finality of judgments is "equally essential to the doctrine of collateral estoppel." Concurring and Dissenting Opinion at 1110.

The finality of judgments is the basis for applying collateral estoppel in the civil context. It reflects both a concern for judicial economy and for the rights of the parties to be secure in judgments obtained. It is difficult to see why either concern should apply here. As suggested above, judicial economy is not an overriding value in the criminal context. *Supra* at p. 1092. Moreover, the right of the government to be secure in a judgment obtained can hardly be said to outweigh the right of a defendant to be free of an improperly obtained verdict.

Under our system of justice, criminal verdicts, if flawed, are never final. They may be, and are, persistently challenged through the writ of *habeas corpus.* If the concern for the appearance of evenhandedness truly rose to a level sufficient to justify general application of non-mutual collateral estoppel, there would be no reason other than convenience to bar previously convicted defendants from asserting it in a *habeas corpus* petition.

given retroactive effect, many prosecutors would need to calculate when to stop pursuing confederates and co-conspirators for fear of automatically reversing a string of successful prosecutions.[54] Alternatively, if the doctrine is not to be given retroactive effect, a decisive premium is placed on the order in which defendants are prosecuted; prosecutors would therefore have to consider carefully which cases are the stronger, and bring them only in the correct order, from the strongest to the weakest. There is no basis for believing that either alternative would improve confidence in our criminal justice system.

There is another reason that weighs against an expanded use of non-mutual collateral estoppel in the criminal context: It has been recognized that in a criminal trial a verdict of not guilty is not the equivalent of an affirmative finding of innocence.[55] If the fact finder admits to a reasonable doubt, it must acquit, whereas in a civil case a jury or judge finds facts on the basis of the preponderance of the evidence. Despite the standard of proof which governs in criminal trials, the Supreme Court held in *Ashe v. Swenson, supra,* that a court, when confronted with a collateral estoppel claim founded upon the constitutional guarantee against double jeopardy, must scrutinize the entire record of a prior proceeding to ascertain what a rational jury must have decided in reaching its decision. If a criminal defendant were to assert a claim of non-mutual collateral estoppel based on a prior criminal proceeding to which he was not a

party, the court, if the collateral estoppel claim were otherwise proper, of course, would have to scrutinize the record of the prior proceeding with extreme care so as not to give the non-party defendant the benefit of any factual findings that were the result of jury confusion, doubt, or compromise.

Moreover, there are additional problems that would ensue if non-mutual collateral estoppel were generally applied in criminal cases tried before a jury. The precise determination of what a jury decided and why can be particularly difficult. In non-jury cases an appellate court is presented with the decision of a trial judge and an explanation of his reasoning. But non-jury verdicts are the exception rather than the rule. In jury cases verdicts frequently are internally inconsistent. It is for this reason that the law long ago abandoned the search for absolute consistency in jury verdicts, however desirable such a result might be in the abstract. *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *United States v. Cindrich,* 241 F.2d 54, 57 (3d Cir. 1957).

The possible inconsistency of verdicts rendered by even a single jury is rather pointedly illustrated by the Niederberger jury itself, which, as to certain of the counts, convicted him of receiving something of value "because of any official act performed or to be performed by him," [56] but acquitted him of receiving "any fee, compensation, or reward . . . for the per-

---

**54.** One way to mitigate this problem would be to refuse to give collateral estoppel effect to previous inconsistent judgments. This is the view taken for civil cases by the Restatement (Second) of Judgments, Tentative Draft No. 3, § 88(4) which suggests that prior inconsistent determinations of a question would preclude giving either determination estoppel effect.

Such a limitation may be helpful if non-mutual collateral estoppel is to be given general application in the criminal context. But just as is the case with the refusal ever to give an acquittal retroactive effect, the limitation on the proposed rule seems to be more the result of prudence than principle. Moreover, like the rejection of retroactivity, the use of § 88(4) in this manner places a high priority on the order of trials. The government would be advised to

always try its strongest case first, thereby gaining a conviction that would allow it to try as many others as needed without fear of non-mutual collateral estoppel. The rule would give every collaborator in a crime no more than two chances at acquittal: his own trial and the trial of the first accomplice brought to trial. Except in rare cases, there seems little reason to afford a defendant more than one opportunity to avoid conviction, and no reason to place a priority on the order cases are tried.

**55.** *Cf. Standlee v. Rhay,* 557 F.2d 1303 (9th Cir. 1977) (acquittal on criminal charge is not binding in a subsequent civil case inasmuch as burdens of proof differ).

**56.** 18 U.S.C. § 201(g).

formance of any duty." [57] It cannot be said with any certainty what prompted the jury to arrive at these seemingly contradictory findings. An insightful observation regarding this phenomenon of disparate jury verdicts was made by Mr. Justice Holmes in *Dunn,* where, relying on a quotation from an opinion by Judge Learned Hand, he said:

> The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.
>
> . . . . .
>
> That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters.[58]

Inasmuch as this is true of a single jury it is *a fortiori* true of different juries, and the likelihood of inconsistent verdicts is in fact increased in the criminal context where the evidence permitted to go to the jury may vary so substantially depending on the particular defendant and the time of trial.

Because *mutual* collateral estoppel is constitutionally required in criminal cases before a jury, Judge Gibbons challenges our reluctance to apply *non-mutual* collateral estoppel in such cases. It is no accident, however, that every case cited in support of giving a general jury verdict collateral estoppel effect—*Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *United States v. Mespoulede,* 597 F.2d 329 (2d Cir. 1979); *United States v. Venable,* 585 F.2d 71 (3d Cir. 1978)—involves a de-

fendant seeking to assert the collateral estoppel effect of a jury verdict that was entered at *his own previous trial.* These cases are double jeopardy cases and they should not, it bears emphasizing, be confused with the present case.

█ Of course, we quite agree with Judge Kaufman, whose observation in a footnote in *Mespoulede* is noted by Judge Gibbons, that the vagaries of jury deliberations—whether prompted by compromise, compassion, confusion, or hostility to the government—may not be relied upon by the government in a double jeopardy case. Otherwise the protection afforded by *Ashe v. Swenson* would be largely eviscerated. It requires a considerable leap, however, to seek to apply the language in the *Mespoulede* footnote, to cases where double jeopardy is not an issue. If a jury chooses to show compassion, or to compromise, or to otherwise mitigate what it perceives to be a severe punishment as to one defendant, that defendant ought to be given the benefits of his jury's determination at any later trial. It is a wholly different matter to suggest that any such compassion or compromise should be transferred, *ipso facto,* to another defendant who might not have merited the jury's sympathy, had he faced trial before them. A jury's decision to refuse to convict a particular defendant, despite overwhelming evidence of his guilt, is an aspect of the ancient common law tradition that has long been viewed as a final safeguard against unjust, or sometimes political, prosecutions.[59] Such verdicts, however irrational they may seem, ought not to be overturned, or even undermined, by giving the government a second opportunity to prosecute the sympathetic defendant. There is no reason, however,

---

**57.** 26 U.S.C. § 7214(a)(2).

**58.** 284 U.S. at 393–94, 52 S.Ct. at 190–191 (quoting *Steckler v. United States,* 7 F.2d 59, 60 (2d Cir. 1925)).

**59.** *See, e. g.,* the discussion of the 1670 trial of two Quakers, Penn and Mead, in *D. Ogg, England in the Reign of Charles II,* 520 (1934); *see also H. Hallam, Constitutional History of Eng-*

*land,* 614–16 (1869) ("Unfortunately it has been sometimes the disposition of judges to claim to themselves the absolute interpretation of facts, and the exclusive right of drawing inferences from them, as it has occasionally, though not perhaps with so much danger, been the failing of juries to make their undeniable right of returning a general verdict subservient to faction or prejudice." *Id.* 616.

for extending the impact of these verdicts beyond the individual defendants who have been fortunate enough to receive them.

Thus the concern voiced by Judge Gibbons that our refusal to extend *Ashe v. Swenson* type estoppel, "if pushed to its logical extreme, would prohibit collateral estoppel, not only in cases like this one, but also in double jeopardy cases," is simply misplaced. Nothing we have said undercuts the right of a defendant to plead the estoppel effect of a prior verdict in his favor, even if the court or the public is convinced he never merited that verdict. The benefits of a jury's compassion or compromise are guaranteed a defendant by the fifth amendment to the Constitution and his verdict cannot, and ought not, to be overturned even if it seems plainly erroneous. But a defendant who has never faced trial is not constitutionally entitled to the same level of protection.

It may be, of course, that even in criminal cases certain situations will arise that would warrant a court to refuse, on grounds of judicial economy or fundamental fairness, to permit the relitigation of matters already clearly resolved in a prior adjudication. In a rare federal case adopting this approach, *United States v. Bruno,* 333 F.Supp. 570 (E.D.Pa.1971), Judge Masterson refused to allow the government to relitigate the falsity of a certain letter against two defendants charged with conspiracy after he had already ruled, in the trial of two other co-conspirators, and on the same evidence, that a jury could not possibly conclude beyond a reasonable doubt that the letter was fraudulent. And in *State v. Gonzalez,* 75 N.J. 181, 380 A.2d 1128 (1977), the New Jersey Supreme Court, on grounds of fairness, invoked non-mutual collateral estoppel to require the suppression of evidence offered against Gonzalez when the same evidence obtained in the same manner

had previously been ordered suppressed against a co-defendant. The New Jersey Court expressed a strong preference for joinder in such cases, seeing no justification for separate judicial determinations of the same question. Similarly, in *People v. Taylor,* 8 Cal.3d 174, 117 Cal.Rptr. 70, 527 P.2d 622 (1974), the California Supreme Court, on the grounds of fairness, used non-mutual collateral estoppel to reverse a felony-murder conviction of a defendant not even present at the site of the crime, when the defendant who had actually committed the felony had previously been acquitted because he lacked the requisite state of mind.[60]

Whatever the merits of these decisions,[61] however, whether as a matter of judicial economy, fundamental fairness, or the perception of judicial integrity, we do not believe that the reasoning employed in them can be extended to cover the present case. In those situations the determinations made by the earlier fact finders were unambiguous. In *Bruno,* the identical government case had been previously found by a judge to be insufficient as a matter of law—and the government had not sought to supplement it. In *Gonzalez,* the search of a car was found by a judge to be unconstitutional. In *Taylor,* the necessary malice to support a felony-murder verdict had not been proven as to the only defendant who could have entertained such malice. Here, in contrast, it is not at all clear what determinations resulted in the internally inconsistent Niederberger verdict.

Moreover, here the evidence before the second fact finder differed in material aspects from that presented to the first fact finder. From what can be gleaned from the *Bruno, Gonzalez* and *Taylor* opinions, the testimony, evidence and issues confront-

---

**60.** *Taylor* is the only criminal case of which we are aware in which a jury finding, as opposed to a judge's ruling, has been given non-mutual collateral estoppel effect.

**61.** *Contrast Clark v. State,* 378 N.E.2d 850 (Ind. 1978), where Indiana, despite its adherence to the common law rule on aiders and abettors,

refused to adopt a general rule of non-mutual collateral estoppel. *See also United States v. Brown,* 547 F.2d 438, 444 (8th Cir.), *cert. denied* 430 U.S. 937, 97 S.Ct. 1566, 51 L.Ed.2d 784 (1977); *United States v. Musgrave,* 483 F.2d 327, 332 (5th Cir. 1973); *Gray v. United States,* 104 U.S.App.D.C. 153, 260 F.2d 483 (1958).

ing both fact finders appear to have been identical. · Here the two trials differed. Niederberger contested receipt of the gifts, at least as to whether they were received within the Western District of Pennsylvania.[62] Standefer did not. Indeed Standefer admitted giving the trips to Niederberger, and relied instead on a "social purposes" defense. The witnesses heard and the evidence admitted at the two trials accordingly varied, and the somewhat differing verdicts, if not predictable, are understandable.

In light of the different nature of the trials and the lack of certainty as to what factual findings were made by the Niederberger jury, as well as the overwhelming evidence in the record here, we are persuaded that resort to the use of non-mutual collateral estoppel in this case would be unjustified. That doctrine is of relatively recent origin, and the precise role it is to play in our criminal jurisprudence has yet to be fully established. But whatever its ultimate extent may be, we do not believe that this appeal, essentially amounting to a classic example of somewhat inconsistent jury verdicts, presents a situation in which a trial court's refusal to apply non-mutual

collateral estoppel can be termed reversible error.

Accordingly, the judgment of the district court will be affirmed on all nine counts.[63]

ALDISERT, Circuit Judge, concurring and dissenting.

The majority of the court finds no fault with Standefer's convictions on Counts 1, 3 and 5 of aiding and abetting a federal revenue agent to receive a gratuity when the agent, Niederberger, as principal, had been acquitted in a previous jury trial. Count 1, relating to the Pompano Beach gratuity, charged Standefer with aiding a violation of 26 U.S.C. § 7214(a)(2);[1] Count 3 was related to the Doral Country Club, and Count 5, the Seaview Country Club. Niederberger had been acquitted of the same charges under 26 U.S.C. § 7214(a)(2), although convicted under 18 U.S.C. § 201(g)[2] with regard to the Doral and Seaview vacations. Because I would hold that Counts 1, 3 and 5 should have been dismissed as a matter of law, I would reverse those convictions and vacate the sentences imposed thereon, while affirming the convictions on the remaining six counts.

These points were considered by the panel that heard this appeal and it was not persuaded that a reversal of the jury's verdict is warranted. The Court *in banc* has not chosen to disturb the panel's conclusions in this regard.

---

**62.** Niederberger challenged the jurisdiction of the court on the ground that none of the trips was received within the Western District of Pennsylvania. Putting aside the merits of this claim, it may be that the jury concluded that the alleged defect should bar conviction as to certain trips. Of course, several other explanations of the jury's findings are possible.

**63.** Standefer alleges certain other errors. He argues that the trial judge, in his instructions to the jury, misrepresented the relevance of testimony of evidence showing an absence of impropriety in Niederberger's audits of Gulf's tax returns; that the trial court erred in charging the jury that there was no need to show an agreement between Standefer and Niederberger; that the court erred in failing to give prior notice to counsel that a point for charge was affirmed; that the court erred in charging the jury as a matter of law that the vacation trips provided Standefer were not authorized; that the court erred in not charging the jury that the government's failure to call Niederberger should result in an unfavorable inference; and that the court erred in failing to instruct the jury that the fact that the trips were undertaken openly and publicly could be considered as negating evidence of wrongdoing.

**1.** 26 U.S.C. § 7214(a)(2) imposes a criminal sanction against:

Any officer or employee of the United States acting in connection with any revenue law of the United States—

(2) who knowingly demands other or greater sums that are authorized by law, or received any fee, compensation, or reward, except as by law prescribed, for the performance of any duty.

**2.** 18 U.S.C. § 201(g) provides:

Whoever, being a public official, former public official, or person selected to be a public official, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself for or because of any official act performed or to be performed by him;

· · · · ·

Shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

My disagreement with the majority reaches to the foundation of criminal law— *nullum crimen, nulla poena, sine lege* (no one shall be punished for anything not expressly forbidden by law). The government, not content with convictions on six facially legitimate counts, presses for an affirmance of these three controversial counts, on which concurrent sentences were imposed, for aiding and abetting a principal to commit a crime previously found not to have been committed.

My position is straightforward and blunt—you cannot clap with one hand; it takes two to tango; to be guilty of aiding another to commit a crime there must first be a crime. I do not accept the convoluted rhetoric advanced by the government but adhere to the position I took in *United States v. Bryan*, 483 F.2d 88 (3d Cir. 1973) (in banc) (Gibbons, J., dissenting), that a person cannot be convicted of aiding and abetting a principal when that principal has been acquitted of committing the charged offense.

## I.

In granting rehearing in banc, the court solicited briefing on the question whether *Bryan* should be overruled. The court, however, has now excursed into new territory beyond the jural exploration of any cited precedent, and has transformed the dubious rule of *Bryan* into a precedent *fortissimo.*

The crime charged in *Bryan* was stealing whiskey, a crime which requires proof of criminal intent. The question posed at Bryan's trial was whether the principal had a criminal intent to steal or was an "innocent dupe." The district court, sitting as trier of fact, found no criminal intent on the part of the principal and therefore acquitted him. It nevertheless found that although the principal did not intend to steal, Bryan intended that the principal steal the whiskey, and accordingly convicted him. This court affirmed Bryan's conviction as an aider and abettor.

Two factors distinguish *Bryan* from this case. First, the offense in *Bryan* required

proof of the principal's criminal intent, and second, Bryan might have been charged as a principal rather than as an aider and abettor. With respect to criminal intent in Niederberger's case, however, we held that the guilt of the principal could be established by proof of

> a public official's receipt of a gratuity, to which he was not legally entitled, given to him in the course of his everyday duties, for or because of any official act performed or to be performed by such public official, and he was in a position to use his authority in a manner which could affect the gift-giver.

*United States v. Niederberger,* 580 F.2d 63, 69 (1978). Thus, this court determined that the government, to make out a case under § 7214(a)(2), need not prove criminal intent by Niederberger to do a specific reciprocal act. Furthermore, it is a crime to receive a gratuity under 26 U.S.C. § 7214(a)(2) only if the gratuity is received by a federal revenue agent in his official capacity. Not being a federal agent, Standefer could not have been indicted as a principal as a matter of statutory definition. Standefer's convictions could thus be reversed without disturbing the viability of the rule in *Bryan*; conversely, Standefer's convictions cannot be affirmed without a dramatic extension of *Bryan.*

## II.

The court characterizes its affirmance as adherence to the "clear majority position," the view of the Model Penal Code, and the view favored by most commentators. Maj. op. at 1086. I disagree with this conclusion of the majority. Indeed, upon analysis, it can be seen that our court's approach here is a lonely one. The majority cites only *one* case which remotely resembles the unusual setting of this case—conviction of an aider and abettor, despite acquittal of the principal, of a crime for which he could not himself have been charged as a principal. *United States v. Azadian,* 436 F.2d 81 (9th Cir. 1971). Even the questionable decision in *Azadian* is distinguishable because the sole reason for the public official's acquittal

there was the trial court's dismissal of the charge due to her entrapment by a government agent. Because the rule in the Ninth Circuit requires a defendant to admit the criminal act before he can successfully assert a defense of entrapment, it is evident that the offense by the principal was established at the joint trial. The principal was acquitted "not because inducement negatives criminal intent and thus establishes the fact of innocence; but because Government agents should not be permitted to act in such a fashion. The defense does not so much establish innocence as grant immunity from prosecution for criminal acts *concededly committed.*" *Id.* at 83 (my emphasis). Thus *Azadian* involved conviction of an aider and abettor when the principal's criminal acts were conceded. In an effort to apply *Azadian* to the facts in *Standefer,* the majority intimates that a similar concession exists here. Although the occurrence of certain golfing trips was established, the criminality of those events is ably and vigorously contested by Standefer and is controverted by the jury verdict at Niederberger's trial.

The majority recognizes the cases of *United States v. Shuford,* 454 F.2d 772 (4th Cir. 1971) and *United States v. Prince,* 430 F.2d 1324 (4th Cir. 1970), which held unambiguously that no conviction of an aider and abettor can stand when the only named principal has been acquitted. And in a markedly understated tone, the majority opinion notes a "scattering" of cases which "take an ambivalent view." [3] I do not find the cases to be ambivalent; I suggest that they unequivocally oppose the result reached by the court and that they severely cloud the "clear" majority position. The question is far closer than the court is willing to admit.

Even if it were the "clear majority position" that an aider and abettor may be convicted despite acquittal of the principal,

the result reached in this case is a giant step beyond the holdings in any of the cases cited by the majority. Professor Edward H. Levi has neatly described the common law decisional process: "the scope of a rule of law, and therefore its meaning, depends upon a determination of what facts will be considered similar to those present when the rule was first announced. The finding of similarity or difference is the key step in the legal process." [4] Recognition of the differences between the material facts of this case and those implicated in every case cited in support of the result reached by the majority leads me to conclude that the cases do not authoritatively support the majority's result.

The Second and Tenth Circuit cases, *United States v. Deutsch,* 451 F.2d 98 (2d Cir. 1971), *cert. denied,* 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972), and *United States v. Coppola,* 526 F.2d 764 (10th Cir. 1975), were both plea bargain cases. Both affirmed aiding and abetting convictions when principals had pleaded guilty to lesser included offenses or to other counts of the indictments. Recognizing the compromise nature of such proceedings, the courts saw no inconsistency in the aiding and abetting convictions. Neither case involved the acquittal of the principal.

The Sixth Circuit case, *Kelly v. United States,* 258 F. 392 (6th Cir.), *cert. denied,* 249 U.S. 616, 39 S.Ct. 391, 63 L.Ed. 803 (1919), did not even involve an indictment under the aiding and abetting statute. In rejecting a challenge to the sufficiency of the indictment, the court's alternative answer included *in dictum,* a statement that persons formerly chargeable as aiders and abettors "may be indicted and prosecuted as principals, whether the principal offender has been indicted and acquitted . . . or has not been indicted at all . . . ." *Id.* at 402 (citations omitted). The statement certainly cannot be regarded as part of the holding of the case.

---

3. *United States v. Bernstein,* 533 F.2d 775, 799 (2d Cir.), *cert. denied,* 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976); *United States v. Smith,* 156 U.S.App.D.C. 66, 478 F.2d 976 (1973); *United States v. Stevison,* 471 F.2d 143

(7th Cir. 1972), *cert. denied,* 411 U.S. 950, 93 S.Ct. 1933, 36 L.Ed.2d 411 (1973).

4. Levi, *An Introduction to Legal Reasoning,* 15 U.Chi.L.Rev. 501, 502 (1948).

The Eighth Circuit case, *Pigman v. United States,* 407 F.2d 237 (8th Cir. 1969), likewise involved no aiding and abetting charge. Rejecting appellant's contention that the government's theory pointed to a codefendant as the principal, the court stated that the appellant "appears to be the instigator and the principal. But if not the principal, the evidence duly shows him to be an aider and abettor. The principal need not be convicted in order to convict a person as an abettor," relying on *Hendrix v. United States,* 327 F.2d 971, 975 (5th Cir. 1964). In *Hendrix,* the appellant was charged *both* as an aider and abettor and as a principal, and his conviction was affirmed despite insufficiency of identification evidence against a codefendant. The court simply held that an aider and abettor may be convicted if he assisted a principal, even if the principal is not identified. Neither *Hendrix* nor *Pigman* stands for the broad proposition asserted by the majority.

*Gray v. United States,* 104 U.S.App.D.C. 153, 260 F.2d 483 (1958), is a very brief per curiam opinion in which it appears that the appellant was charged as a principal, not as an aider and abettor. That opinion relies on two cases, neither of which involved acquittal of a principal. In one, *Meredith v. United States,* 238 F.2d 535, 542 (4th Cir. 1956), no principal was charged, and in the other, *Colosacco v. United States,* 196 F.2d 165, 167 (10th Cir. 1952), the principal had pleaded guilty. Moreover, the more recent case of *United States v. Smith,* 156 U.S. App.D.C. 66, 69, 478 F.2d 976, 979 (1973), suggests that the District of Columbia Circuit would now require acquittal of an aider and abettor if the principal were acquitted:

> Jarvis was convicted upon the theory that he aided and abetted Smith. Logically it follows that if the principal Smith had been acquitted Jarvis should also have been found not guilty; in other words error that damaged Smith's defense was also prejudicial to Jarvis. Accordingly we think the interests of justice require that the conviction of Jarvis should also be reversed.

The First Circuit case of *Giragosian v. United States,* 349 F.2d 166 (1st Cir. 1965), also discussed in the majority opinion, charged an aider and abettor with a crime for which he could not have been indicted as a principal because the substantive statute, 18 U.S.C. § 656, applied only to bank officers, directors or employees. The conviction of the aider and abettor was reversed because the government had failed to produce sufficient evidence that the principal, a bank officer who was not tried, had committed the substantive offense.

Both the Second and Seventh Circuits have recently rejected this court's position in *Bryan.* Each approved an instruction to a jury in trials of defendant principals that a codefendant aider and abettor could not be convicted without conviction of the principal. In *United States v. Bernstein,* 533 F.2d 775, 799 (2d Cir.), *cert. denied,* 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976), the court stated that because "it is the law that a person cannot be found guilty of aiding and abetting unless a principal whom he has aided and abetted committed the criminal act," it was not error to instruct the jury that the aider and abettor could not be convicted unless the jury also convicted the principal. *United States v. Stevison,* 471 F.2d 143, 147–78 (7th Cir. 1972), *cert. denied,* 411 U.S. 950, 93 S.Ct. 1933, 36 L.Ed.2d 411 (1973), under almost identical facts, affirmed a similar jury instruction because "[t]he presupposition that an aider and abettor may be convicted, since 1951, absent conviction of the principal is invalid."

Therefore, our *Bryan* case and the Fifth Circuit case of *United States v. Musgrave,* 483 F.2d 327 (5th Cir. 1973), are the only two cases which unequivocally hold that the acquittal of the only principal does not preclude conviction of the aider and abettor. If circuit-counting is a proper consideration, there is more precedential support to the view I espouse than there is for this court's majority view.

### III.

The court distinguishes the acquittal of the aiders and abettors in *Shuttlesworth v. City of Birmingham,* 373 U.S. 262, 83 S.Ct.

## 1102

1130, 10 L.Ed.2d 335 (1963), because "[t]he act that they had helped to bring about was simply not a criminal act" but was constitutionally protected. The court, therefore, finds irrelevant the Supreme Court's statement, "It is generally recognized that there can be no conviction for aiding and abetting someone to do an innocent act." *Shuttlesworth, supra,* at 265, 83 S.Ct. at 1132. But it is precisely because "Standefer himself admitted that all the vacations listed in the indictment were provided to Niederberger and paid for by Gulf," maj. op. at 1088, that Niederberger's acquittal can only be interpreted as a jury finding that receipt of the vacations in question was an innocent act. I do not think *Shuttlesworth,* the only Supreme Court pronouncement on the subject, can be so cavalierly dismissed.

### IV.

My focus thus far has been to demonstrate major distinctions between the material facts before us and those present in *Bryan* and other cases relied on by the majority. This is not to agree that *Bryan* was a sound decision, however, for with Chief Judge Seitz I joined in Judge Gibbons' dissent. I reaffirm my endorsement of Judge Gibbons' analysis in *Bryan;*[5] *a fortiori,* I would not extend that holding beyond the facts which controlled there. A court "must be alert to see that a doubtful precedent be not extended by mere analogy to a different case if the result will be to weaken or subvert what it conceives to be" sound legal precepts. *Dimick v. Schiedt,* 293 U.S. 474, 485, 55 S.Ct. 296, 300, 79 L.Ed. 603 (1935).

What divided the *Bryan* court and what divides the court here is the weight to be placed on competing principles of criminal law when the source of decision is not unerringly supplied by precedent, statute or the Constitution. My conclusion is predicated on different principles than those selected by the majority. Three fundamental

reasons convince me that an aider and abettor cannot be convicted when the only possible principal has been acquitted.

### A.

The first is my doubt that Congress, in enacting 18 U.S.C. § 2, the aiding and abetting statute, ever intended that an aider and abettor might be convicted when the principal has been acquitted. Although this court has asserted for thirty years that a defendant may be convicted of aiding the commission of a felony under 18 U.S.C. § 2 even though the alleged principal has been acquitted, *see United States v. Klass,* 166 F.2d 373, 380 (3d Cir. 1948), I believe that our position has not properly reflected congressional intent.

Common law distinguished between felonies and misdemeanors for the purpose of accomplice liability. *See* W. LaFave & A. Scott, Criminal Law 496 (1972). The criminal responsibility of an accessory to a noncapital felony was purely derivative, that is, conviction or outlawry of the principal was an absolute prerequisite to conviction of the accessory. If the principal was unknown, at large, or pardoned prior to trial, the accessory could not be punished. Needless to say, acquittal of the principal precluded conviction of the accessory. *See generally id.* at 495–501. Where the substantive offense was a misdemeanor, however, all participants, including accessories before the fact, were considered principals in the offense and could be tried, convicted, and punished without regard to the disposition of charges against other parties. *See id.* at 496.

Under federal law, of course, there are no common law crimes. The federal courts have jurisdiction only over actions specifically proscribed by Congress. *United States v. Hudson,* 11 U.S. (7 Cranch) 32, 3 L.Ed. 259 (1812). Thus, in the nineteenth century, a person could be convicted in federal court of aiding and abetting a particu-

---

5. Judge Gibbons has now retreated somewhat from the position he took in 1973. *See* concurring opinion, p. 1108: "I agree with the conclusion in Parts I and II of the majority opinion that the acquittal of a principal does not, . . . necessarily preclude the conviction of one charged with aiding and abetting."

lar felony only if Congress had defined aiding and abetting that felony as a crime. *See, e. g., United States v. Crane,* 25 Fed. Cas. p. 691, No. 14,888 (C.C.D.Ohio 1847). Congress, employing a variety of formulations, scattered a number of specific accessory provisions throughout the statutes of the period. *See, e. g.,* Act of March 3, 1825, ch. 64, § 45, 4 Stat. 114 (buying stolen mail); R.S. § 5323 (1878) (piracy); R.S. § 5427 (1878) (naturalization offenses); R.S. § 5466 (1878) (destroying mail).

Where a federal statute made the substantive offense a misdemeanor, however, no specific statutory authorization was necessary to prosecute an accomplice. *See United States v. Mills,* 32 U.S. (7 Pet.) 138, 141, 8 L.Ed. 636 (1833). The federal courts simply assumed that Congress had acted on the common law principle that "all who aid, abet, procure, or advise the commission of a misdemeanor are guilty as principals." *United States v. Snyder,* 14 F. 554, 556 (C.C.D.Minn.1882). *See also Gallot v. United States,* 87 F. 446, 448 (5th Cir. 1898).

This scheme prevailed until Congress revamped the federal penal code in 1909, when it enacted a general provision making it a crime to aid or abet the commission of any federal offense:

> Whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal.

Act of March 4, 1909, ch. 321, 35 Stat. 1152. This provision became § 332 of the penal code and has survived without relevant substantive change. It is now codified at 18 U.S.C. § 2(a), the provision at issue in this case.

Four years after the enactment of § 332, the Ninth Circuit offered an interpretation of Congress's intent:

> The effect of the section under consideration is to abolish the distinction between principals and accessories in offenses defined in the laws of the United States, whether the same be felonies or misdemeanors. . . . [Section 332] is a recognition by Congress that the old distinction between principals and accessories which pertained to felonies is generally abrogated, and that a charge against one formerly known as an accessory is good against him as principal.

*Rooney v. United States,* 203 F. 928, 932 (9th Cir. 1913).

Several courts, including our own, accepted *Rooney's* analysis uncritically, holding that Congress had intended to treat all accessories in the same manner as accessories to misdemeanors had been treated at common law. *See United States v. Klass, supra,* 166 F.2d at 380; *Von Patzoll v. United States,* 163 F.2d 216, 218 (10th Cir. 1947). *See also United States v. Bryan,* 483 F.2d 88, 95, 98 (3d Cir. 1973) (in banc); *Kelly v. United States,* 258 F. 392, 402 (6th Cir. 1919). In the absence of other evidence, this analysis might be persuasive because Congress treated felons and misdemeanants uniformly and employed the terminology "is a principal" which was often used at common law to refer to the legal status of an accessory to a misdemeanor.

Primary evidence of congressional intent, however, is available. The final form of § 332 was reported out of the Senate on January 7, 1908. The report accompanying the bill is enlightening. *See* S.Rep.No.10, pt. 1, 60th Cong., 1st Sess. (1908). First, the report indicates that § 332 was derived, not from common law or state statutes, but from two specific accomplice statutes then in effect, R.S. § 5323 (piracy) and R.S. § 5427 (naturalization offenses). In explaining the introduction of § 332 and its companion provision setting the relevant penalties, the Senate noted "[t]hese sections are new only in the sense that they are made general in their application. They explain themselves." *See* S.Rep.No.10, pt. 1, at 26.

Moreover, the Senate clearly stated its purpose in enacting a general accomplice provision:

> The committee has deemed it wise to make those who are accessories before the fact at common law principal offenders, thereby permitting their indictment and conviction for a substantive offense.

At common law an accessory cannot be tried without his consent before the conviction or outlawry of the principal except where the principal and the accessory are tried together; if the principal could not be found or if he had been indicted and refused to plead, had been pardoned or died before conviction, the accessory could not be tried at all. This change of the existing law renders these obstacles to justice impossible.

S.Rep.No.10, pt. 1, at 13.

This report does not indicate that the Senate even recognized the common law distinction between felonies and misdemeanors for the purpose of accomplice liability, let alone intended to abrogate it entirely. I cannot conclude that Congress would have abolished such a rule of law, as suggested by *Rooney*, without indicating in some way that it perceived the rule in the first place.

In addition, the report tells us that an accomplice could be convicted when the principal escaped, failed to plead, was pardoned, or died. The Senate expressed a clear intention to remove "these" impediments to justice. Conspicuously and significantly absent from this litany is any mention to the case where the principal has been acquitted.

To the extent that *Rooney* and subsequent cases interpreted § 332 and its descendants by generalizing the common law misdemeanor rule, I believe they have been in error. Congress has spoken on the issue, and what ambiguity remains must be construed in favor of the defendant. Chief Justice Marshall, in a similar context, stressed the predominance of this latter rule over other "maxims or rules for the construction of statutes":

The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the

rights of individuals; and on the plain principle, that the power of punishment is vested in the legislative, not in the judicial department.

*United States v. Wiltberger,* 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820). The viability of this principle has been reasserted with emphasis in recent Supreme Court opinions. *Dunn v. United States,* 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979); *United States v. Naftalin,* 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979); *United States v. Culbert,* 435 U.S. 371, 379, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978).

### B.

The second reason why I think acquittal of the principal requires acquittal of the aider and abettor has been aptly stated by the majority:

The problem of allowing two seemingly inconsistent verdicts to survive is naturally troubling, and a rule of law that eliminates such apparently contradictory results is, therefore, not without appeal. Moreover, in the criminal context, the government's success in securing a guilty verdict against an aider and abettor after failing to secure such a verdict against a principal may strike some as giving the prosecution "two bites at the apple" and therefore as bordering on unfairness.

Maj. op. at 1088. "There is much to be said, in the criminal law context, for associating the doctrine of collateral estoppel with the principles of due process. Plainly, the appearance of evenhandedness in the administration of justice weighs heavily among our jurisprudential concerns, and estoppel is directly addressed to that appearance." *United States ex rel. Hubbard v. Hatrak,* 588 F.2d 414, 417 (3d Cir. 1978). This is an institutional reason,[6] implementing the maxim that "justice must satisfy the appearance of justice,"[7] which

---

6. I use the description "institutional reason" in this respect somewhat differently than Professor Robert S. Summers in his important taxonomic analysis of substantive reasons in judicial opinions. *See* Summers, *Two Types of Substantive Reasons: The Core of a Theory of*

*Common-Law Justification,* 63 Cornell L.Rev. 707, 722–24 (1978).

7. *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954); *accord* 2 J. B. Atlay, Victorian Chancellors 460 (1908) (quot-

has little to do with the individual rights of Standefer.

Surely the public will not readily understand the court's holding that a revenue agent did not receive a gift but a private citizen helped him receive the gift he did not receive. This is the stuff that "sidebars" in newspapers are made of, that smirking telecasters eagerly devour in thirty-second squibs. "People do take judicial reasoning seriously," Professor Charles A. Miller has observed, "and they are not fools nor being fooled in doing so, at least no more than in other forms of communication or with respect to other strands that form the web of a political culture."[8] Legal reasoning cannot be artificial, esoteric, or understandable only to an elite legal priesthood; it must be capable of public comprehension.

Standefer is not proposing, nor do I propose, "to give him refuge in the imagined remnant of a common law rule regarding the dependency of verdicts against aiders and abettors." Maj. op. at 1091. But neither do I assume that "a tidy consistency" is equivalent to a foolish consistency,[9] and I am undaunted by accusations of pursuing "scholastic quiddities." *Id.* I insist that a small measure of consistency is essential, that there must be some dependency between aiding or abetting and the offense that is aided or abetted. Simply put, in our language these are transitive verbs. It is no justification for Standefer's conviction that public reaction to exclusionary rules may be unpopular. Public reaction to Standefer's conviction for aiding Niederberger to commit an offense which a previous jury had acquitted Niederberger of committing will be, and should be, equally unpopular.

The result I would reach concededly may be considered an application of some form of collateral estoppel. To reach the result, however, it is not necessary to broadcast a principle that non-mutual collateral estoppel will henceforth control all criminal cases in this circuit. I am mindful of the pitfalls noted by the majority which would attend promiscuous and indiscriminate application of the concept. I agree that if this were the law, "many prosecutors would need to calculate when to stop pursuing confederates and co-conspirators for fear of automatically reversing a string of successful prosecutions." Maj. op. at 1095. In the rush to reaffirm and extend the rule of *Bryan,* however, the case of Mr. Standefer seems somehow to have been forgotten. Regardless of the issue on which rehearing in banc was granted, the court is deciding *this* criminal case and no other. Instead of speculating about a string of successful prosecutions in other cases, we must focus on a relatively short string of prosecutions—the successful trial of Standefer preceded by the unsuccessful trial of Niederberger. We need not theorize about complex inchoate criminal cases with multiple and lengthy trials, multiple defendants, great variations in available and admissible evidence and a host of other factors not present in this case. Our system of adjudication is the common law tradition, the adjudication of the specific instance. "Every new case is an experiment; and if the accepted rule which seems applicable yields a result which is felt to be unjust, the rule is reconsidered."[10] Our tradition "creeps from point to point, testing each step,"[11] and is preeminently a system built up by gradual accretion. We decide only the facts before us, attaching a definite detailed legal consequence to a definite detailed set of facts.

---

ing Lord Herschell: "[I]mportant as it was that people should get justice, it was even more important that they should be made to feel and see that they were getting it."). *United States v. Birdman,* 602 F.2d 547, 554 n.25 (3d Cir. 1979).

**8.** C. Miller, The Supreme Court and the Uses of History 12 (1969).

**9.** "A foolish consistency is the hobgoblin of little minds, adored by little statesmen and philosophers and divines." Emerson, *Self Reliance* (1841).

**10.** M. Smith, Jurisprudence 21 (1909).

**11.** A. Whitehead, Adventures of Ideas, Chap. 2, § 6.

To consider consequences that might occur in other cases containing factual problems not before us is always legitimate, whether in a lawyer's brief or a judge's opinion, but it is just argument. The rules of logic inexorably limit permissible rhetoric; one risks committing the fallacy of division, erroneously reasoning that what holds true of a composite whole necessarily is true for each component part considered separately, or being seduced into the fallacy of *ignoratio elenchii,* irrelevant evidence, proving unrelated point B instead of point A, which is at issue, or disproving point D instead of point C.

Here, we are confronted with two short trials of two individual defendants on virtually identical indictments returned simultaneously by the same grand jury on essentially the same evidence involving a common set of facts. If, in this case, my analysis is an application of collateral estoppel, I do not argue that collateral estoppel is mandated by due process. But to hold that estoppel is not constitutionally required does not mean that other sound reasons do not warrant its application. I am convinced that under the facts of this case, the need for the appearance of justice demands this result. To this extent I join Judge Gibbons' views on collateral estoppel set forth in his concurring opinion.

### C.

Finally, I detect in the majority's analysis what seems to be a presumption of guilt which cannot be overcome by a jury verdict of acquittal. Because of "seemingly contradictory findings," maj. op. at 1096, the court apparently feels free to speculate as to what might have prompted Niederberger's acquittal—presumably something other than his innocence. The majority sees no injustice in allowing the government another chance to prove Niederberger's guilt in a second trial, so long as Niederberger is not present to defend himself. Because the government was permitted to convince *Standefer's* jury that Niederberger was guilty, the majority finds both a guilty principal and a valid aiding and abetting conviction without anyone having been placed twice in jeopardy. This reasoning is foreign to our system of criminal law; that it constitutes fundamental unfairness to Standefer cannot be gainsaid.

The competing principles at work here are well known. The government has a justifiable interest in seeing that crime be prevented, public safety promoted, public norms of behavior vindicated by the imposition of merited punishment, and anti-social conduct deterred by the imposition of penalties. The appellant, on the other hand, invokes the guiding principle of criminal law—the presumption of innocence—and the complementary principles that penal laws are to be strictly construed, that ambiguities should not be resolved so as to embrace offenses not clearly within the law, that facts charged and proved must bring the defendant plainly and unmistakably within the statute, and that no person can be criminally punished unless the acts for which he is punished were clearly forbidden.

Judges constantly strive to seek an accommodation between these sets of competing principles. There are times, however, when the scales seem evenly balanced, when it is difficult to determine exactly where the weight does lie. At these times the jural philosophy of the individual judge comes into play, consciously or otherwise, by means of a value judgment that places a greater weight on one competing principle than another. "Indeed, the most important attributes of a judge are his value system and his capacity for evaluative judgment," writes Professor Robert S. Summers. "Only through the mediating phenomena of reasons, especially substantive reasons, can a judge articulately bring his values to bear."[12]

---

12. Summers, *supra* note 6, at 710.

Consider also the observations of Professor Paul Freund:

Much of law is designed to avoid the necessity for the judge to reach what Holmes called his "can't helps," his ultimate convic-

The issue before us constitutes a classic example of how one's jural philosophy may predetermine a decision. When confronted by a close case in criminal law, necessitating the expression of a value judgment, I cast my lot in favor of the individual and not the society that seeks to regulate his conduct. To me this is an *a priori* proposition distilled not only from the Constitution but from the philosophical foundation of Anglo-American common law. "Administration of a technical and often semantical criminal justice system is the price we pay for the balance struck in the Constitution between the federal government and the individual defendant." *Bryan, supra,* 483 F.2d at 99 (Gibbons, J., dissenting).[13] The balance is struck because, in Dean Rostow's words, "[t]he root idea of the Constitution is that man can be free because the state is not."[14]

The expression of this value judgment is not confined to the fashioning of a rule for a particular case. It begins with the choice of a controlling legal precept, continues through the interpretation of that choice, and persists finally in the application of the precept as interpreted to the facts at hand. Value judgments inhere throughout; it is not a mechanical process.[15] Values do not form in a vacuum; their range depends always on factual limitations. Thus, judges' decisions are governed by their beliefs about facts as well as abstract rules; the act of deciding involves both the determination of material facts and the determination of what rules are to be applied to the facts. Jerome Frank observed, cynically perhaps, that a judge "unconsciously selects those facts which, in combination with the rules of law which he considers to be pertinent, will make 'logical' his decision."[16]

At bottom there are two dimensions of this court's division, a division which can be traced to basic differences in values. One dimension involves the analysis of the materiality of the facts in this case and the facts

tions or values. The force of precedent, the close applicability of statute law, the separation of powers, legal presumptions, statutes of limitations, rules of pleading and evidence, and above all the pragmatic assessments of fact that point to one result whichever ultimate values be assumed, all enable the judge in most cases to stop short of a resort to his personal standards. When these prove unavailing, as is more likely in the case of courts of last resort at the frontiers of the law, and most likely in a supreme constitutional court, the judge necessarily resorts to his own scheme of values. It may therefore be said that the most important thing about a judge is his philosophy; and if it be dangerous for him to have one, it is at all events less dangerous then the self-deception of having none.

Freund, *Social Justice and the Law,* in Social Justice 93, 110 (R. Brandt ed. 1962).

13. "The problem is not so much that the acquittal of the so-called principal requires the acquittal of the aider and abettor. Under statutes such as 18 U.S.C. § 2, the aider and abettor is in law guilty of the substantive offense to the same extent as the so-called principal. The offense of each is complete in itself without the dependency of one on the other. . . . The grand jury did not indict Bryan as a principal. It did not indict him as an aider and abettor of persons unknown. It indicted him as an aider and abettor of a specific named principal. The Government in response to a motion for a bill of particulars reiterated that Echols was the thief who stole the whiskey with an intent to convert it to his own use and that Bryan aided and abetted Echols by supplying the means by which Echols converted the whiskey to Echols' own use. . . . The district court may not convict him of being an aider and abettor on the basis of evidence relevant only to a charge of being a principal; a charge for which he was not indicted." *United States v. Bryan, supra,* 483 F.2d at 98 (Gibbons, J., dissenting).

14. Rostow, *The Democratic Character of Judicial Review,* 66 Harv.L.Rev. 193, 195 (1952).

15. In deciding whether to apply a given precept to a case before him, the judge must, if he is to be guided or controlled by substance rather than form, accommodate the interests now pressing for recognition in terms of the interest accommodations made by the precept in question. If he determines that there is a complete correspondence between the specific interests before him and the interests considered and accommodated in the precept, the case can be "decided" by applying, through a process of logical analysis, that precept. The crucial step, the decision that the abstract pattern of interests accommodated in the precept and the concrete pattern to be accommodated, is not a purely mechanical operation.

A. Von Mehren, The Civil Law System 822 (1957).

16. J. Frank, Law and the Modern Mind 134–35 (1930).

in other cases cited by the court. To decide which facts are similar and material is a purposeful decision. The second dimension is the decision to extend a rule to a variant set of facts. To do this a judge must first be convinced that the rule being extended is a desirable one. I find the *Bryan* rule offensive to the integrity of our judicial institution and to those principles protecting an individual's freedom, which I believe deserve priority over those favoring the society that would regulate him. For these telling reasons I am loathe to extend the rule beyond the limited facts which gave it birth.

Chief Judge SEITZ joins in Judge ALDISERT'S opinion except that his dissenting position is based solely on IV–A of the opinion.

GIBBONS, Circuit Judge, concurring in part, and dissenting in part:

I agree with the conclusion in Parts I and II of the majority opinion that the acquittal of a principal does not, as a matter of statutory interpretation, necessarily preclude the conviction of one charged with aiding and abetting. I cannot, however, accept the majority's reluctance to acknowledge a role for non-mutual collateral estoppel in criminal cases. Moreover, I am persuaded that this case may well be an appropriate instance in which to apply it.[1] Indeed, the majority's statutory analysis, eliminating the distinction between principals and aiders and abettors, and thus treating Standefer as if he were Niederberger, logically points to the application in Standefer's favor of the collateral estoppel that would be available to Niederberger.

In *Hubbard v. Hatrak*, 588 F.2d 414 (3d Cir. 1978), this court held that non-mutual collateral estoppel was not required in criminal cases by the Due Process Clause of the Constitution. Accordingly, we noted, in the absence of state law to the contrary, appellant Hubbard could not attack his conviction for felony-murder on the ground that his accomplice had previously been convicted simply of second-degree murder. Nevertheless, we recognized that there is a significant interest in the appearance of fairness, an interest which may often be vindicated by a policy of collateral estoppel.

> There is much to be said, in the criminal law context, for associating the doctrine of collateral estoppel with the principles of due process. Plainly, the appearance of evenhandedness in the administration of justice weighs heavily among our jurisprudential concerns, and estoppel is directly addressed to that appearance. For that reason thoughtful observers probably will applaud the introduction of non-mutual collateral estoppel into New Jersey criminal law.

588 F.2d at 417–18. Thus, while we could not say that the "appearance of evenhandedness in the administration of justice" was of constitutional dimensions, we acknowledged that it "weighs heavily among our jurisprudential concerns."

A concern for the appearance of evenhandedness in the administration of justice persuades me that where the government has truly had a full and fair opportunity to prove its case, any fact which was necessarily determined against it should be applied in a second defendant's favor in a new trial.[2] The majority, on the other hand, seems to use a different scale in gauging the weight of this fairness concern.

1. By urging a consideration of non-mutual collateral estoppel in this case, rather than contending that the acquittal of a principal requires the acquittal of an aider and abettor, I do not retreat from the views I expressed in my dissenting opinion in *United States v. Bryan,* 483 F.2d 88 (3d Cir. 1973) (en banc). In *Bryan* I stated that because Bryan was explicitly indicted as an aider and abettor of a named principal, he could not be convicted "on the basis of evidence relevant only to a charge of

being a principal." 483 F.2d at 98. To do so would be to convict Bryan of "a charge for which he was not indicted." *Id.* Because of this variance from the indictment, I thought Bryan's conviction could not stand. No issue of variance is presented on this appeal.

2. *See* Restatement (Second) of Judgments § 88 (Tent. Draft No. 2 1975), *quoted with approval in State v. Gonzalez,* 75 N.J. 181, 380 A.2d 1128, 1132 n.5 (1977).

We agree that confidence in the integrity of the criminal justice system is, to some extent, diminished when one criminal escapes punishment while another—particularly one charged as a result of acts performed by the acquitted defendant—is convicted and sentenced. Majority Opinion at 1093. Nevertheless, it adds, "we do not believe the 'appearance of evenhandedness' is so overriding a concern that it should, as a general matter, warrant the same type of protection as is mandated by the Constitution." *Id.* Many of the reasons marshalled by the majority for relegating collateral estoppel virtually to a legal oblivion are beside the point. First, the opinion notes, "a large number of acquittals result from the enforcement of evidentiary and constitutional rules that prohibit the prosecution from proving as much as it might were it completely unfettered." *Id.* at 1094. This, however, is not an argument against the application of non-mutual estoppel in all criminal cases; rather, it is a reason why great care must be exercised in deciding whether the government has truly had a full and fair opportunity to prove its case, and whether a particular fact was necessarily determined against it in the prior litigation. Some, but not all, constitutional and evidentiary rules do deprive the government of a "full and fair" opportunity to prove its case. Where, for example, the defendant in the first trial claimed the protections of the fifth amendment, the government has been foreclosed from establishing as much as it legitimately might in the absence of such a claim. The fifth amendment vindicates a uniquely personal right of privacy, *see generally* Note, *Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments,* 90 Harv.L.Rev. 945 (1977), and thus a second defendant is not entitled to the collateral estoppel benefits of the first defendant's personal right. On the other hand, where the first acquittal was the result of the government's inability to introduce unlawfully seized evidence, a second defendant, as to whom that evidence would also be relevant—and perhaps even independently admissible—might be permitted to assert an estoppel defense. The issue, of course, is not free from doubt and I leave for another time the question of whether fourth amendment requirements, together with other constitutional and evidentiary restrictions, effectively preclude the government from a full and fair opportunity to prove its case. That is, unless the majority's apparent aversion to collateral estoppel forecloses further consideration of these issues.

Second, the majority opposes non-mutual collateral estoppel because it suspects that the government may refuse "to prosecute some co-defendants at all for fear of jeopardizing stronger cases yet to be tried, or convictions already obtained." Majority Opinion at 1094. If subsequent cases are indeed stronger, because of different procedural opportunities or newly available evidence, collateral estoppel treatment need not be given to the first decision.[3] It is only where the government has had a truly full and fair opportunity to press its position that a subsequent bite at the apple is precluded. Moreover, adherence to the policies of collateral estoppel does not require a court to overturn previous convictions because of subsequent acquittals. While the principle of evenhandedness is undoubtedly

3. *See, e. g.,* Restatement (Second) of Judgments § 88(2), *quoted with approval in State v. Gonzalez,* 380 A.2d, at 1132 n.5:

§ 88. Issue Preclusion in Subsequent Litigation with Others.

A party precluded from relitigating an issue with an opposing party, in accordance with §§ 68 and 68.1, is also precluded from doing so with another person unless he lacked full and fair opportunity to litigate the issue in the first action or unless other circumstances justify according him an opportunity to relitigate the issue. The circumstances to which consideration should be given include those enumerated in § 68.1 and also whether:

(2) The forum in the second action affords the party against whom preclusion is asserted procedural opportunities in the presentation and determination of the issue that were not available in the first action and that might likely result in the issue's being differently determined. . . .

implicated in such inconsistent verdicts, a respect for the finality of judgments—equally essential to the doctrine of collateral estoppel—requires leaving well enough alone. I have no trouble endorsing a future-focused policy of estoppel, barring the government from repeated efforts at establishing the same fact or facts, while at the same time opposing a backward-focused policy which would make a nullity of prior judgments. The issue is whether the government, having lost once, should be given a second opportunity. The majority's discussion of retroactivity, introduced for the purpose of injecting the emotional issue of collateral attacks on criminal judgments, is a straw man argument.

The majority is also uncomfortable with non-mutual collateral estoppel in criminal cases because it might allow a defendant to plead as an established fact what may have been the result of doubt, confusion or compromise. But this argument surely proves too much. As the Second Circuit recently observed:

> [T]he Government suggests that the jury may have compromised, and hence what was actually decided can never be known. But this assertion is made in the teeth of clear case law that the possibility that the jury acquitted out of a desire to compromise or to show mercy, or from "simple frustration after hours of tedious debate," *United States v. Flowers*, 255 F.Supp. 485, 487 (E.D.N.C.1966); *see, e. g., Cosgrove v. United States*, 224 F.2d 146, 154 (9th Cir. 1955), is not a basis for refusing to apply collateral estoppel. A contrary rule would, of course, eviscerate the doctrine altogether, for no one who is not present during the jury's deliberations can ever know precisely how the jury reached its verdict.

*United States v. Mespoulede*, 597 F.2d 329 (2d Cir. 1979). Moreover, the majority's contention—that the previous verdict may have been compromised or confused—would seem to bar estoppel, not only when it is a *second* defendant who seeks the benefits of that verdict, but also in instances where the defendant in the first trial is tried on a new count or related charge. Yet, collateral es-

toppel is plainly available—indeed constitutionally required—in these latter cases, despite the possibility of compromise or confusion. *See Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *United States v. Venable*, 585 F.2d 71 (3d Cir. 1978).

The majority also suggests that the anti-harassment aspect of double jeopardy disappears in the non-mutual context because Standefer has not been tried before. Majority Opinion at 1092. The difference between mutual and non-mutual collateral estoppel here, however, is one of degree. To suggest that Standefer, though not a party to the Niederberger trial, was not subjected to an accusation that he bribed Niederberger, is to elevate form over substance. Standefer's alleged conduct certainly was exposed to public scrutiny and his reputation tarnished.

Finally, the majority notes that "[t]he precise determination of what a jury decided and why can be particularly difficult. In non-jury cases an appellate court is presented with the decision of a trial judge and an explanation of his reasoning. But non-jury verdicts are the exception rather than the rule." Majority Opinion at 1095. Once again, this argument, if pursued to its logical extreme, would prohibit collateral estoppel, not only in cases like this one, but also in double jeopardy cases. Yet, the Supreme Court has, in the latter context at least, expressly enjoined trial courts to " 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' " *Ashe v. Swenson*, 397 U.S. at 444, 90 S.Ct. at 1194 (quoting Mayers & Yarbrough, Bis Vexari: *New Trials and Successive Prosecutions*, 74 Harv.L.Rev. 1, 38–39 (1960)). In so doing, courts are not to be bound by the "hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." *Ashe*, 397 U.S. at 444, 90 S.Ct. at 1194. Surely the capacity of courts to

pursue the inquiry into what was finally determined by a prior verdict does not dissolve outside the narrow range of double jeopardy cases. We do it in civil cases tried to a jury with relatively little difficulty.

In the final analysis, I suppose I simply take more seriously than the majority the perception of unfairness inherent in the disparate treatment of similarly situated defendants. I do not think the public is oblivious to the marked differences in legal and financial resources that exist between separate defendants and which often result, for all intents and purposes, in an acquittal for one and a conviction for another. And I agree with Judge Aldisert that "the public will not readily understand the court's holding that a revenue agent did not receive a gift but a private citizen helped him receive the gift he did not receive." Concurring and Dissenting Opinion at 1105. Evenhandedness cannot, of course, be pursued in isolation from the legal obstacles which preclude a full and fair hearing for the government; neither can it blind us to the fact that, very often, it will be impossible to discern what a given adjudication finally determined. However, evenhandedness counts for something, and the majority cannot wish it away on the strength of rationales that suggest abrogation of the doctrine in the double jeopardy, and in many civil contexts as well.[4]

Believing as I do that non-mutual collateral estoppel should occasionally be available in criminal cases, it seems to me useful to sketch briefly how the doctrine should operate procedurally. In *United States v. Inmon*, 568 F.2d 326, 330 (3d Cir. 1977), we noted that double jeopardy is a defense which must be pleaded by the defendant.

Since a defendant's interest in avoiding double jeopardy is a matter of constitutional right, it follows that where double jeopardy is not involved, and the defendant's interest in collateral estoppel is strictly non-constitutional, the defendant must also come forward and put in issue the question of estoppel. The government may then present evidence tending to show that it lacked a full and fair opportunity to prove its case the first time, or that the fact which the defendant seeks to foreclose from relitigation was not actually determined in the first proceeding. The ultimate burden of establishing that the fact in question was actually determined in the first litigation rests with the defendant, who seeks the protections of estoppel. *See, e. g., United States v. Seijo*, 537 F.2d 694, 697 (2d Cir. 1976), *cert. denied*, 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977); *United States v. Davis*, 460 F.2d 792, 796 (4th Cir. 1972); *United States v. Smith*, 446 F.2d 200, 202–03 (4th Cir. 1971). The government, on the other hand, retains the burden of establishing that it did not receive a full and fair opportunity to litigate the issue sought to be foreclosed.

Once the pleadings are before the trial court, that court must decide whether the issue was actually determined in the first trial, and whether the government had a fair opportunity to establish its version. In discharging this function, trial courts would, pursuant to the *Ashe* Court's injunction, survey the record of the first trial and determine whether a rational jury could have predicated its decision on a basis other than that which the defendant seeks to foreclose. The trial judge is invested with great discretion in performing this task. He must, in addition, consider any argu-

---

4. The majority cites several cases which have rejected the application of non-mutual collateral estoppel to criminal trials. It is true that the policy has not thus far achieved extensive support. There are, of course, a number of courts who have accepted such estoppel claims. *See, e. g., United States v. Shuford*, 454 F.2d 772 (4th Cir. 1971) (acquittal of principal would require acquittal of aider and abettor); *United States v. Prince*, 430 F.2d 1324 (4th Cir. 1970) (per curiam) (same); *United States v. Bruno*, 333 F.Supp. 570 (E.D.Pa.1971); *State v. Gonzalez*, 75 N.J. 181, 380 A.2d 1128 (1977); *People*

*v. Taylor*, 12 Cal.3d 686, 117 Cal.Rptr. 70, 527 P.2d 622 (1974). *Cf. also United States v. Casper*, 541 F.2d 1275, 1278–79 (8th Cir. 1976) (apparently accepting the reasoning of the trial court that the lack of privity between the defendants in the first and second trials did not bar the application of collateral estoppel). Nevertheless, as the majority itself observes, "the apparent novelty" of non-mutual collateral estoppel in criminal cases "does not necessarily make it inappropriate or unwise." Majority Opinion at 1092.

ments offered by the government which suggest why a full and fair opportunity to establish the facts was not available in the first trial. I have suggested above how some of these latter concerns might be resolved.[5]

In the instant case, Standefer did come forward and put in issue the estoppel effect of Niederberger's acquittal on several counts. See Appendix at 17a–19a (motion to dismiss). While his contention could have been more artfully presented, I think, at the very least, he has preserved the estoppel question for purposes of review. Because Standefer's estoppel claim was imprecise, the trial court did not rule on the motion. Thus, to the extent that estoppel is arguably available in this case, I believe a remand to the trial court is required.

Standefer contended that a judgment of acquittal should have been entered on COUNTS 1, 3, and 5 of the indictment against him. Count 1 charged a violation of 26 U.S.C. § 7214(a)(2) in connection with the alleged Pompano Beach gratuity; Count 3 charged a violation of the same statute in connection with the Doral Country Club; Count 5 charged a violation of the same statute in connection with the Seaview Country Club. Because Niederberger had been acquitted of these same charges, Standefer sought to foreclose relitigation of the charges in his trial. As I noted above, the trial court did not reach the estoppel question. As to Counts 3 and 5, however, this was harmless error. While the first jury did acquit Niederberger under 26 U.S.C. § 7214(a)(2) of the Doral and Seaview offenses, it nevertheless convicted him of those same transactions under 18 U.S.C. § 201(g). These inconsistent verdicts perhaps reflected a misconception on the jury's part of the appropriate legal standards for liability under the two statutes. Whatever the reason for the jury's confusion, however, such inconsistent verdicts cannot serve as the basis for collateral estoppel. *See, e. g., Harary v. Blumenthal,* 555 F.2d 1113, 1116–17 (2d Cir. 1977).

The Pompano Beach violation in Count 1, however, cannot be similarly dispatched.

Niederberger was acquitted under both statutes for the Pompano Beach violation. As the majority notes, Niederberger testified in his own behalf, and there is no showing on this record why collateral estoppel is not at least arguably appropriate. Accordingly, I would remand for district court findings on this Count.

The majority, in its effort to play both sides against the middle, contends that even if non-mutual collateral estoppel may occasionally be recognized, this is not the case in which to do so. The majority reasons that the inconsistent verdicts effectively undermine the preclusive effect of the entire Niederberger verdict, even with respect to the Pompano Beach Count. I disagree. Whatever inconsistencies were inherent in the other charges against Niederberger, the findings with respect to Pompano Beach were thoroughly consistent. In *Rogers v. LaVallee,* 517 F.2d 1330 (2d Cir. 1975), *cert. denied,* 423 U.S. 1078, 96 S.Ct. 866, 47 L.Ed.2d 89 (1976), the Second Circuit considered an analogous issue. A defendant had been acquitted on charges of first and second degree kidnapping under one section of a kidnapping statute; the jury was hung, however, on first and second degree charges under another section of the statute. The defendant was retried on the first degree charge and was convicted, despite the fact that he had already been acquitted of second degree kidnapping, a necessary element in the first degree charge. The district court rejected defendant's habeas corpus motion, in which he had urged collateral estoppel based on double jeopardy. The court reasoned that the apparent inconsistencies in the verdict as a whole precluded the court's finding that any binding determination in defendant's favor had been made. The Second Circuit rejected that view, however. In reversing and granting the writ of habeas corpus, the court declared:

The difficulty with the district court's point of view, however, is that it rests on the proposition that "viewing the verdict herein as an entity and as a whole, I

---

5. *See* p. 1109 *supra.*

cannot find that the jury herein necessarily acquitted petitioner of kidnapping 2nd degree." In fact, however, the jury did just that, however erroneously and no matter how confused. The verdict was an express acquittal of kidnapping in the second degree. It was rendered without correction by the trial court and without objection to the inconsistency by the prosecution.

517 F.2d at 1334 (footnote omitted). Admittedly, this was a double jeopardy case; yet, the principle of evenhandedness also requires courts to give full effect to final judgments, without ascribing to those judgments the inconsistencies inherent in other parts of a jury's determinations.

The majority also rejects the application of estoppel in this case because, it reasons, the evidence in Standefer's trial was different from that introduced against Niederberger. Specifically, the majority notes, Standefer testified at his trial and did not contest the receipt of the trips. But that objection misses the point. If estoppel had been granted at the outset, Standefer may never have had to testify or present a defense. Because Standefer's testimony might never have been offered had his estoppel claim been granted, it cannot be said that the admittedly damaging evidence elicited from him renders the estoppel question harmless or, in the majority's view, irrelevant.

The majority straddles an uneasy line in this case. It refuses to endorse non-mutual collateral estoppel in criminal cases while balking at rejecting the doctrine outright. In its labored effort to avoid any resolution of the issue, it fails adequately to suggest why, if estoppel is ever to be applied, this is not an appropriate occasion to do so. But I reserve for last a more important criticism than any having to do with the particular result reached by the majority, a result which, I concede, is a respectably arguable one. Specifically, I object to the premises upon which the majority in this case has acted. The majority argues:

The public interest in the accuracy and justice of criminal results is greater than the concern for judicial economy professed in civil cases and we are thus inclined to reject, at least as a general matter, a rule that would spread the effect of an erroneous acquittal to all those who participated in a particular criminal transaction.

Majority Opinion at 1093. In the first place, the argument in favor of non-mutual collateral estoppel in criminal cases is not, as the quoted language at last tacitly suggests, based upon concerns for judicial economy. I agree that concerns for judicial economy should play a much smaller role in criminal justice decisionmaking than they do.

Next, I am less confident than the judges in the majority in my capacity, or theirs, to know what is an "erroneous acquittal." The institution of jury trial supplanted trial by ordeal, not because juries were thought to be more likely to achieve objective truth than were druids or soothsayers, but because the participation in the fact-finding process of a cross-section of the community was deemed to lend a sufficient legitimacy to that imperfect process to make publicly acceptable the imposition of sanctions. In the criminal context, when the sovereign fails to convince that ad hoc tribunal, sanctions are not imposed. But the application or withholding of sanctions results not because the verdict is either correct or incorrect in any objective sense, but because under our legal system our government has chosen not to sanction when it fails to convince beyond a reasonable doubt. Despite their confidence, neither I nor the judges in the majority can really determine that the *Niederberger* acquittal was erroneous. Indeed, the odds are exactly even that when the government is given a second chance to convince a new jury of a given set of facts the second verdict, rather than the first, will be objectively incorrect. The issue is not whether either verdict is correct, but whether the government, having gone to the well once, should be given a second opportunity. When the defendant is the same, the double jeopardy clause prohibits the second trip to the well without regard to the correctness or incorrectness of the initial verdict. When the defendant is, by virtue of 18 U.S.C. § 2, treated as if he is the same, it is hard to identify the justifica-

tion for a different outcome. And, while non-mutual collateral estoppel is not constitutionally mandated, I submit that its desirability as a non-constitutional rule of criminal law should also be determined without engaging in speculation as to which of two successive verdicts on the same alleged facts is more likely to be correct.

In addition, the majority's statement that "the purpose of a criminal court is . . . to vindicate the public interest in the enforcement of the criminal law," Majority Opinion at 1093, discloses an erroneous view both of the public good and of the role of an independent judiciary in a sanctioning system. Sanctioning, ultimately, depends upon the availability of physical power. A sovereignty, having a practical monopoly upon the application of physical power, could sanction merely by the application of that power. Resort to the ritual of courts and trials, however, reflects a desire to gain public acceptance for the imposition of sanctions, thereby hopefully reducing the incidence of resistance and the need to resort to force. Our democratic legal system is predicated upon the assumption that such ends are desirable. Accordingly, our rules for criminal justice sanctioning have been carefully designed so as to maximize both the fact and appearance of fairness, by deliberately tilting many rules in favor of the defendant and against the sovereign. In a given instance the result of that system may be to deprive the sovereign of the opportunity to punish a malefactor. But that result can be deemed a public harm only if one loses sight of the long-range benefits of a system deliberately designed to tolerate such results. Their occasional occurrence is no public harm but rather a public good, in that they represent the system's functioning as it was designed to function. Moreover, judges do not possess physical coercive power, but serve only to legitimate its imposition. Since legitimation is the essential contribution of the judicial system, judges act consistently with their function, and thus in the public interest, only when they adopt rules maximizing fairness to defendants. If those rules occasionally produce results which temporary majorities abhor, that should be of little concern to the courts, for our perspective must be determined by the long-range benefits accruing from our efforts to secure the appearance of fairness. By pursuing fairness, rather than acting as law enforcement agents, we achieve, in the long-run, the willing consent of the governed. The republic will not fall because the court concludes that the government should, when it loses before one jury, be collaterally estopped from proceeding on the same issues before another. But it will be endangered if judges conclude that they must "vindicate the public interest in the enforcement of the criminal law," rather than develop rules which satisfy the claims of individual fairness.

Because I accept a role, albeit limited, for collateral estoppel in criminal cases, and because the trial court has not yet made the findings sufficient to show why estoppel is inappropriate in this case, I respectfully dissent from the affirmance of Standerfer's conviction on the Pompano Beach count. I concur, however, in the affirmance of the Doral and Seaview convictions.